## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-033

Filing Date: June 18, 2018

Docket No. S-1-SC-36028

IN THE MATTER OF
ANHAYLA H., a child,

STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,

       Petitioner-Petitioner,

v.

KEON H.,

       Respondent-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**William E. Parnall, District Judge**

New Mexico Children, Youth & Families Department
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Petitioner

Law Offices of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

for Respondent

## OPINION

**MAES, Justice.**

**{1}** The New Mexico Children, Youth and Families Department (the Department) appeals from a judgment of the Court of Appeals reversing the district court's termination

1

of Father's parental rights with regard to Child. The Court of Appeals concluded that the Department failed to make reasonable efforts to assist Father in remedying the conditions and causes of neglect and abuse that rendered Father unable to properly care for Child under NMSA 1978, Section 32A-4-28(B)(2) (2005). *See State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2017-NMCA-004, ¶ 1, 387 P.3d 313. We granted certiorari to review whether the district court's determination that the Department made reasonable efforts to assist Father was supported by substantial evidence. We reverse the Court of Appeals opinion and affirm the district court order terminating Father's parental rights.

## I.    BACKGROUND

**{2}**    On February 20, 2013, Mother and Father took two-month-old Child to the hospital. Mother and Father reported that two days prior Father had been standing and rocking Child when he accidentally dropped her on the carpet. Child was in critical condition, having sustained multiple fractures, including twenty-three rib fractures and four skull fractures in various stages of healing, facial bruising, liver lacerations, brain bleeding, and a possible detached retina. Doctors determined that the "volume, distribution, and severity of [Child's] injuries [were] not consistent with a short fall in the home" and instead evidenced multiple incidents of blunt force trauma to Child's head and body. Child is severely physically and mentally impaired as a result of the injuries.

**{3}**    On February 25, 2013, the Department filed a petition with the district court alleging Child to be neglected and/or abused under NMSA 1978, Section 32A-4-2 (2009, amended 2017). Mother and Father entered no contest pleas to the neglect and abuse allegations on April 5, 2013. The adjudicatory and dispositional hearing was held on April 22, 2013. An initial judicial review hearing and three permanency hearings were held between May 20, 2013 and August 22, 2014. Father's termination of parental rights hearing was conducted over two days, approximately six months apart, August 27, 2014 and February 6, 2015. Pertinent details of the various hearings are outlined below.

## A.    Initial Custody

**{4}**    The Department took Child into custody on February 21, 2013 on allegations of neglect and/or abuse filed February 25, 2013. On February 26, 2013, the district court granted the Department continued custody of Child until further order. On March 7, 2013, a custody hearing was held; both Mother and Father were present. At the custody hearing, the court ordered Mother and Father to participate in psychosocial, psychological, domestic violence, substance abuse, and parenting assessments, as well as drug screens. Mother was also instructed to participate in an independent living skills assessment. The court further instructed Mother and Father to keep their attorneys and the Department's permanency planning worker (PPW) apprised of their current addresses and phone numbers at all times and promptly notify them of any changes. The Department assigned Richard Gaczewski as the PPW for Child and Diane Drobinski as the PPW for Mother and Father.

2

**B.     Mediation and Plea**

**{5}**     On April 5, 2013, Mother and Father participated in a mediation conference and pled no contest to Child being neglected and/or abused under Section 32A-4-2 (2009, amended 2017).  The factual basis for Mother's and Father's plea agreements was that Child was seriously injured while in the care of Mother, Father, and others, and "no action was taken by [Mother or Father] to protect [Child] from injury or seek medical care."  Mother's stipulated judgment and disposition also noted that "domestic violence in the home between [Father] and [Mother] in the presence of [Child] [had] impaired [Mother's] ability to provide for the care, safety and supervision of [Child]."

**C.     Adjudication and Disposition**

**{6}**     At the adjudicatory and dispositional hearing on April 22, 2013, the district court adopted the Department's proffered findings of fact and incorporated into its order the Department's family treatment[1] plan and predispositional study dated April 16, 2013. Although the court had ordered several assessments, the treatment plans recommended by the Department for Mother and Father called for initial psychosocial assessments on which other Department recommendations would be based.  By the hearing date, Mother had completed her psychosocial assessment and the Department had developed personalized treatment recommendations for her.  Father had not yet participated in his psychosocial assessment and thus only had the one item in his treatment plan.[2]

**{7}**     The record indicates that at the time of the hearing, Father was homeless and did not have an address.  Father was not returning phone calls from his PPW, Ms. Drobinski, nor did he show for a scheduled office visit.  Father's only visits with Child occurred prior to the adjudicatory hearing.  The Department described one visit as "problematic" because Father had "angrily grabbed [Mother's] cell phone from her hands" when they were having an argument.  The district court ordered Mother and Father to "undergo psychological

---

[1]The district court's orders in the case refer to the Department's plans for Mother and Father as "case" plans instead of "treatment" plans.  The terms appear to be used interchangeably by both the court and the parties.  For consistency, we refer to the plans as "treatment" plans throughout this opinion. We do note, however, that when the Legislature amended the disposition statute in 2016, it substituted the word "case" for "treatment" throughout.  *See* NMSA 1978, § 32A-4-22(C) (2016).

[2]Father's name was not originally listed in the parent/guardian plan items of the summary treatment plan; the summary only indicated that a psychosocial assessment was due. This typographical error was discussed on February 24, 2014 at the second permanency hearing. The parties acknowledged that this was simply an oversight. Father's name is listed in the family treatment plan, and there is nothing in the record to indicate that there was any confusion about Father's responsibility to participate in a psychosocial assessment.

evaluations and treatment to be arranged by the [Department] or consistent with [the c]ourt's order." The court also ordered Mother and Father to maintain regular contact with their attorneys and the PPW regarding the court-ordered treatment plans, court dates, and the case in general.

**D.      Initial Judicial Review Hearing**

{8}      The initial judicial review hearing was held on May 20, 2013. Mother was present by phone; Father was not present. The district court adopted the Department's facts and proposed family treatment plan contained in the judicial review and/or permanency hearing report dated May 20, 2013. The Department stated in the report that it offered Mother and Father office visits with their PPW to conduct psychosocial assessments, create treatment plans, and coordinate supervised visits with Child. The court found that Mother was participating in her treatment plan and regularly visiting Child. Father, however, had made no efforts to comply with his treatment plan, had made no efforts to maintain contact with Child given his circumstances and his abilities, and had not been in contact with the Department since the plea hearing on April 5, 2013. Because Father was not present at the hearing, the court asked Father's attorney if Father had been in contact with her. Father's attorney stated that she called Father the day before and asked if Father had been in contact with the Department. She said that Father told her that he had not been in contact with the Department, that he had not started to engage in his treatment plan, and that the only thing he was doing was looking for a job.

**E.      Initial Permanency Hearing**

{9}      The initial permanency hearing was held on November 25, 2013. Mother was present; Father was also present, having been transported from the Metropolitan Detention Center (MDC). The district court adopted the Department's facts and proposed family treatment plan contained in the judicial review and/or permanency hearing report dated November 25, 2013. The Department informed the court that Father was in custody due to a domestic violence incident with Mother. The Department also informed the court that Mother had been making good efforts at working her treatment plan but had recently stopped participating and that Father had made no efforts to participate in his treatment plan. Father's attorney told the court that Father intended to take his domestic violence charge to trial, so she did not expect that case to be resolved prior to the neglect and abuse proceedings.

{10}      During the hearing, Father's attorney volunteered that Father had not been good about keeping in touch with her. In response, the court explained to Mother and Father the importance of maintaining contact with the Department. The court said, "When there's a problem, you need to go to the Department and let the Department know . . . [if you are] homeless . . . don't have a phone . . . can't get to the [urine analyses], . . . whatever. The Department's job is to make reasonable efforts to fix those things; so I'll ask the Department to do that, and I'll ask you to communicate with the Department so that [it will] do that."

4

The court reminded Father that there were programs Father could complete while in custody and encouraged him to "keep that in mind and do what you can." Father responded, "Yes, sir." The court changed Child's permanency planning goal from reunification to adoption, but ordered the Department to make reasonable efforts to implement the family treatment plan and ordered Mother and Father to make reasonable efforts to comply with the plan.

## F. Second Permanency Hearing

**{11}** The second permanency hearing was held on February 24, 2014. Mother was present; Father was also present, having been transported from MDC. The district court adopted the Department's facts and proposed family treatment plan contained in the judicial review and/or permanency hearing report dated February 24, 2014. In the report, Ms. Drobinski informed the court that Father had twice been scheduled for his psychosocial assessment but canceled both appointments, and that Mother's visits with Child had been canceled after Mother's domestic violence incident with Father. Further, Ms. Drobinski indicated that Father had not been in touch with the Department and had not participated in his treatment plan, but did note that Father had once visited with Child. Ms. Drobinski also informed the court that she visited Father at MDC in November 2013, that Father was transferred to Texas, and that she asked Father's attorney how to write to Father.

**{12}** The guardian ad litem, Karen Cantrell, was present and testified that Child would need highly skilled and specialized care for her entire life. Ms. Drobinski was also present and provided information about Child's therapy needs and the type of training a caregiver would need in order to provide Child with the twenty-four-hour-a-day care that Child requires. Ms. Drobinski testified that, at a minimum, Child's caregiver would need to participate in training with the Association for Retarded Citizens of Albuquerque or another agency of that type, and participate in Child's occupational therapy, physical therapy, and hippotherapy.

## G. Motion to Terminate Parental Rights

**{13}** On March 26, 2014, the Department filed a motion to terminate the parental rights of both Mother and Father, stating that Mother and Father "have been unable or unwilling to make the necessary changes to parent [Child] in a minimally safe and adequate manner." The Department alleged that Mother had stopped participating in her treatment plan items and that Father was in substantial non-compliance with his treatment plan and had abandoned Child. The Department asserted that, despite reasonable efforts by the Department to assist Mother and Father, it was "unlikely the underlying causes of the neglect [would] change in the foreseeable future." The Department also asserted that additional efforts would be futile. Father filed a response to the motion, denying the allegations. Mother ultimately voluntarily relinquished her parental rights.

## H. Third Permanency Hearing

5

**{14}** On August 22, 2014, the district court held a third permanency hearing. Mother was present; Father was also present, having been transported from MDC. The district court adopted the Department's facts and proposed family treatment plan contained in the judicial review and/or permanency hearing report dated August 22, 2014. The court found that the Department had made reasonable efforts to implement the treatment plans of Mother and Father, that Mother had made some efforts to comply with her treatment plan but that her participation had been inconsistent, and that Father had made no effort to comply with his treatment plan. Again, the court ordered Mother and Father to participate in their treatment plans.

## I.    Termination of Parental Rights Hearing—First Day

**{15}** The termination of parental rights hearing began on August 27, 2014. On the day of the hearing, Mother voluntarily relinquished her parental rights to Child. Thereafter, the termination proceedings pertained solely to Father's parental rights. The court heard testimony from three witnesses: Luanne Stordahl, a family service coordinator and developmental specialist at Inspirations Early Intervention, Inc.; Richard Gaczewski, a senior PPW with the Department; and Father.

### 1.    Luanne Stordahl's Testimony

**{16}** Ms. Stordahl testified that Child did not have any medical issues at birth; but when Ms. Stordahl evaluated Child in March 2013 when Child was approximately three months old, Child "was not using the right side of her body" and had "difficulty maintaining eye contact or [fixating] on toys or objects." Ms. Stordahl specifically described Child's visual diagnoses, which included multiple brain and eye issues. Child was assessed as having "delays in her motor skills, feeding skills, vision skills . . . and communication skills." Subsequent reassessments reconfirmed those delays. Ms. Stordahl testifed that as a result, Child was referred to multiple therapies, one of those being hippotherapy. When asked who could participate in hippotherapy with Child, Ms. Stordahl testified that both parents would have been able to participate. She stated that Mother had attended some sessions, but to her knowledge Father had never attended any sessions. Ms. Stordahl testified that she had not had any contact with Father.

### 2.    Richard Gaczewski's Testimony

**{17}** Mr. Gaczewski testified that he was currently Father's PPW and had been since March 21, 2014. Mr. Gaczewski testified that he was also serving as Child's PPW and had been Child's PPW since March 2013. As Child's PPW, he worked closely with Ms. Drobinski, Father's first PPW, and later reviewed her notes about Father's case when he took over as Father's PPW.

**{18}** Mr. Gaczewski testified that Department PPWs are responsible for meeting monthly with parents, conducting psychosocial assessments, working with parents to create treatment

6

plans, and coordinating services for parents and children. Mr. Gaczewski testified that as Child's PPW, he participated in the creation of the treatment plans in this case. When asked why Father's treatment plan contained only one element—the psychosocial assessment—as opposed to Mother's treatment plan which incorporated numerous items, Mr. Gaczewski explained that the psychosocial assessment is the first step of a treatment plan and that when the psychosocial assessment is complete, the Department establishes a more comprehensive treatment plan based upon the client's needs. Mr. Gaczewski said that Father came into the office at the beginning of the case but did not complete the psychosocial assessment.

**{19}** Mr. Gaczewski testified that Mother, on the other hand, completed her psychosocial assessment right away and had been working her treatment plan. Mr. Gaczewski indicated that as Child's PPW, he worked more with Mother than Father because Mother was involved in the case and Father was not. Mr. Gaczewski testified that Mother regularly attended sessions, that he interacted with Mother during visits, and that he performed Mother's independent living assessment. He said he would have done the same for Father had Father shown interest in being involved in the case.

**{20}** Mr. Gaczewski testified that Father was present at the custody hearing on March 7, 2013 and the mediation conference and plea hearing on April 5, 2013, and was made aware of his treatment plan. Father was also provided with the Department's contact information. Mr. Gaczewski testified that a PPW is always present at mediations and court hearings and that the PPW carries business cards containing the Department's contact information. To Mr. Gaczewski's knowledge, Father was not incarcerated between March 2013 and November 2013.

**{21}** Father was arrested in November 2013 for a domestic violence incident with Mother.[3] Mr. Gaczewski testifed that Ms. Drobinski visited Father at MDC after this arrest, but Father's psychosocial assessment was not completed at that time. Mr. Gaczewski testified that Ms. Drobinski's notes from the visit did not indicate anything other than the fact that Father told Ms. Drobinski he had been homeless and without a phone and that was why he had not contacted the Department.

**{22}** The remainder of Mr. Gaczewski's testimony focused on the contact Mr. Gaczewski had with Father after being assigned as Father's PPW on March 21, 2014. Mr. Gaczewski testified that he had not had any contact with Father because Father's whereabouts were unknown to him until August 2014. He testified that he made efforts to try to locate Father by asking Mother about Father's whereabouts, but Mother provided no information. He also said he checked the MDC website around April or May 2014 and again in July 2014, but Father was not listed as an inmate the times Mr. Gaczewski checked. Mr. Gaczewski testified that he did not send Father letters because Father was not listed on the MDC

---

[3]On January 15, 2015, the State filed a nolle prosequi as to Father's criminal charges related to the domestic violence incident with Mother. *See* Case No. D-202-CR-2013-05298.

website, but said he would have sent Father letters if he had located him. Mr. Gaczewski testified that between March 2014 and July 2014 Father had not contacted him, nor had Father visited Child.

**{23}** Mr. Gaczewski testified that Father had contact information for the Department but never attempted to make contact with the Department, never sent letters to the Department, never made phone calls to the Department, and never had anyone contact the Department on his behalf. Mr. Gaczewski reiterated that both the Department and Father were responsible for making efforts toward reunification of the family and that it was not solely the Department's responsibility. Mr. Gaczewski testified that Ms. Drobinski left a message on her voice mail when she left her PPW position which provided Mr. Gaczewski's phone number and Mr. Gaczewski's supervisor's phone number, and that the voice mailbox was open through July 2014. Mr. Gaczewski testified that he never received a message from Father and that Mr. Gaczewski's supervisor never contacted Mr. Gaczewski about receiving any messages from Father.

**{24}** Mr. Gaczewski testified that in his opinion, Child would incur great bodily harm if Child were returned to Father. He testified that Child's highly specialized needs would not be met given Father's lack of involvement in any services to date. To mitigate these safety threats, he noted that Father would have to participate in the psychosocial assessment, that the Department would have to look at Father's "levels of functioning," that "referrals would . . . need to be made," and that Father would have to be involved "with [Child's] service providers over a period of time, maybe six months, so that [Father could] have a full understanding of the long-term needs of [Child]." Mr. Gaczewski testified that Father had made no attempts to provide for Child and that the last contact Father had with Child was in March 2013. Mr. Gaczewski testified that in light of this information, the conditions that rendered Father unable to properly care for Child could not be changed in the foreseeable future. He further testified that Child was adoptable, based on monthly home visits he conducted with Child from March 2013 to April 2014, and that it was in Child's best interest to terminate Father's parental rights.

### 3. Father's Testimony

**{25}** Father testified that he had been incarcerated continuously since October 9, 2013. He stated that MDC sent him to Texas twice but that during those times his name would have appeared on MDC's website as being in custody at MDC had the Department attempted to locate him. Father reiterated that he had never, at any point since October 9, 2013, been released from MDC's custody.

**{26}** The district court noted during Father's testimony that the Department typically sends letters to incarcerated parents reminding them to work the treatment plan, along with self-addressed, stamped envelopes. Father testified that Ms. Drobinski did not have Father participate in a psychosocial assessment when she visited him in custody at MDC in November 2013, nor did she ever send him letters or self-addressed, stamped envelopes. He

8

also testified that Ms. Drobinski never invited Father to make an appointment to do a psychosocial assessment or offered Father any dates to do the assessment. Father further testified that when Ms. Drobinski visited Father at MDC in November 2013, the only information Ms. Drobinski provided to Father was that Child's permanency planning goal would be changed from reunification to adoption. Father also testified, however, that he never communicated with the Department while he was in custody, never requested that a psychosocial assessment be completed, and never requested to participate in his treatment plan.

**{27}**  At the end of the first day of the termination of parental rights hearing, the Department indicated that it needed to call a rebuttal witness. The court determined that a recess would be required and continued the hearing for approximately six months. The hearing resumed on February 6, 2015.

**J.  Termination of Parental Rights Hearing—Second Day**

**1.  Richard Gaczewski's Testimony**

**{28}**  Mr. Gaczewski testified again for the Department. Mr. Gaczewski first addressed Father's testimony that Father had been continuously incarcerated since October 2013. To rebut this testimony, the Department introduced bench warrants issued for Father in May, June, and August 2014 in Father's pending criminal cases. Mr. Gaczewski testified that he checked Father's pending criminal cases and was able to determine that, contrary to Father's testimony, Father had, in fact, been in and out of custody during this time. Mr. Gaczewski stated that he checked the MDC website around the time the bench warrants were issued and that Father was not listed as an inmate. Mr. Gaczewski testified further that in reviewing Father's pending criminal cases, he determined that Father's current incarceration was for neglect and abuse charges, the same allegations that brought Child into the Department's custody.

**{29}**  Mr. Gaczewski testified that on September 2, 2014, six days after the first day of the termination hearing, he mailed a letter to Father at MDC. With the letter, he included a psychosocial assessment and self-addressed, stamped envelopes. Father promptly completed and returned the psychosocial assessment. Upon receiving Father's psychosocial assessment, Mr. Gaczewski updated Father's treatment plan with personalized treatment recommendations. On September 23, 2014, Mr. Gaczewski mailed Father another letter in which he specified the treatment plan items and suggested ways for Father to meet the items while incarcerated.

**{30}**  At the hearing, Mr. Gaczewski identified many of the requirements outlined in Father's plan: participate in psychological, substance abuse, and parenting assessments and follow the recommendations; participate in domestic violence counseling classes; participate in Child's non-emergency medical appointments; provide contact information for possible placements for Child; provide a financial plan for how Father would support Child; maintain

9

contact with the Department PPW at least once a month; inform the Department PPW of any changes in Father's address or phone number; and provide contact information for Father's case manager at MDC. Mr. Gaczewski acknowledged that some of the items in the new treatment plan, such as Father attending Child's medical appointments, were impossible for Father to fulfill while in jail, but Mr. Gaczewski had included recommendations for how Father could fulfill each item while incarcerated. For example, as to Child's medical appointments, Mr. Gaczewski indicated that he intended to provide Father with updates regarding Child's medical needs. Mr. Gaczewski testified that he never heard back from Father. Father only sent letters to Child.

**{31}** Mr. Gaczewski testified that he sent follow-up letters to Father on October 16, 2014 and again on November 21, 2014, but did not receive a response. Mr. Gaczewski further testified that he informed Father in his November 21, 2014 letter that Father and Child were receiving new PPWs and he provided contact information for those workers. Father's new PPW was identified as Lareina Manuelito.

## 2. Lareina Manuelito's Testimony

**{32}** Lareina Manuelito, Father's third PPW, then testified about her contact with Father in the months leading up to the second day of the termination of parental rights hearing. Ms. Manuelito testified that she received letters from Father in December 2014 and January 2015, but the letters were specifically directed to Child, not to her. She testified that she sent a letter to Father at the end of January 2015, attaching a copy of Father's previous treatment plan, notes from the last home visit with Child, and self-addressed, stamped envelopes so Father could correspond with her and with Child. When Ms. Manuelito was asked why she had not contacted Father in November or December 2014, Ms. Manuelito testified that she was acclimating to her new role as a PPW. Ms. Manuelito also testified that the Department was not currently authorizing visits to clients in jail and that PPWs were only communicating through letters. Ms. Manuelito testified that she had not received any documentation from Father regarding his treatment plan.

## K. Termination of Father's Parental Rights

**{33}** At the close of the second day of the termination of parental rights hearing, the district court criticized the Department for not doing more for Father while he was incarcerated, but ultimately found that the Department made reasonable efforts to assist Father under the facts and circumstances of the case. The court also found that the conditions and causes of Child's neglect and abuse were unlikely to change in the foreseeable future. The court did not enter a finding of futility or aggravated circumstances. The court terminated Father's parental rights.

**{34}** Father appealed the termination of his parental rights, arguing that the Department had not fulfilled its obligation to make reasonable efforts and that the Department "made its own determination from the outset that efforts to work with Father toward reunification

would be futile." The Court of Appeals reversed, finding that there was not substantial evidence to prove by clear and convincing evidence that the Department made reasonable efforts. *Keon H.*, 2017-NMCA-004, ¶¶ 1, 19. The Court of Appeals noted that the Department was free to bring additional allegations of neglect or abuse on remand. *Id.* ¶ 18.

**{35}** The Department petitioned for a writ of certiorari on the issue of whether the Court of Appeals erred in reversing the district court's finding of reasonable efforts. We granted certiorari and exercise our jurisdiction to review the opinion of the Court of Appeals under Article VI, Section 2 of the New Mexico Constitution and Rule 12-502 NMRA.

## II. STANDARD OF REVIEW

**{36}** There is no dispute that Child was neglected and/or abused as defined by the Children's Code. *See* § 32A-4-2 (2009, amended 2017). The issue before the Court is whether there was substantial evidence to support the district court's finding that the Department made reasonable efforts to assist Father. *See* § 32A-4-28(B)(2). "The statutory prerequisite of reasonable efforts to assist the parent must be satisfied before parental rights may be terminated." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 21, 132 N.M. 299, 47 P.3d 859. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.* ¶ 22 (internal quotation marks and citation omitted).

**{37}** "Parents have a fundamental liberty interest in the care and custody of their children; due process of law is required before parents can be deprived of that right." *State ex rel. Children, Youth & Families Dep't v. Marlene C.*, 2011-NMSC-005, ¶ 37, 149 N.M. 315, 248 P.3d 863. Due process requires that findings necessary to terminate parental rights be supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982); *State ex rel. Children, Youth & Families Dep't v. Nathan H.*, 2016-NMCA-043, ¶ 31, 370 P.3d 782. "Clear and convincing evidence means evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Nathan H.*, 2016-NMCA-043, ¶ 31 (internal quotation marks and citation omitted).

**{38}** "Our standard of review is therefore whether, viewing the evidence in the light most favorable to the [Department], the fact finder could properly determine that the clear and convincing evidence standard was met." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066; *see also State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (requiring clear and convincing evidence in termination cases). Our standard of review does not require us to determine "whether the [district] court could have reached a different conclusion." *Patricia H.*, 2002-NMCA-061, ¶ 31. Furthermore, this Court is not permitted to "reweigh the evidence." *Eventyr J.*, 1995-NMCA-087, ¶ 3; *see also State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶¶ 24, 28, 128 N.M. 701, 997 P.2d 833 (providing that when reviewing a termination of parental rights case, the

11

appellate court must not reweigh the evidence nor assess the credibility of witnesses, but must defer to the conclusions of the trier of fact).

## III.    DISCUSSION

### A.    Termination of Parental Rights Proceedings and the Reasonable Efforts Requirement

**{39}**    The reasonable efforts requirement originated in the Adoption Assistance and Child Welfare Act of 1980, which conditioned federal funding on the requirement that states put forth reasonable efforts to reunify a family before placing a child up for adoption. *See* Cristine H. Kim, *Putting Reason Back into the Reasonable Efforts Requirement in Child Abuse and Neglect Cases*, 1999 U. Ill. L. Rev. 287, 288 (1999) (citing 42 U.S.C. §§ 620-28, 670-79a) (1991, amended 1997). Congress enacted this legislation to limit the "unnecessary placement of children in foster care who could have been adequately protected at home if their families had access to support services." Kim, *supra*, at 289. Congress later amended this legislation to clarify that the child's health and safety is the paramount concern in determining the reasonable efforts to be made and in making those efforts. *See* Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115 (1997) (codified as amended in scattered sections of 42 U.S.C.); 42 U.S.C. 671(a)(15)(A) (2012). In the amended legislation, Congress sought to strike a balance between the interests of family unity and health and safety. Kim, *supra*, at 316-17.

**{40}**    The New Mexico Legislature has adopted the same approach to the reasonable efforts requirement: "Reasonable efforts shall be made to preserve and reunify the family, with the paramount concern being the child's health and safety." *See* § 32A-4-22(C) (2009, amended 2016); *see also In re Grace H.*, 2014-NMSC-034, ¶ 45, 335 P.3d 746 ("A child's health and safety shall be the paramount concern." (quoting NMSA 1978, § 32A-1-3(A) (2009))). District courts, in termination of parental rights proceedings, are instructed to "give primary consideration to the physical, mental and emotional welfare and needs of the child." Section 32A-4-28(A). Section 32A-4-28(B)(2) provides that the district court shall terminate parental rights to a neglected or abused child when

> the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite *reasonable efforts* by the [D]epartment or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

(Emphasis added.) The district court may excuse the reasonable efforts requirement when "there is a clear showing that the efforts would be futile" or "the parent has subjected the child to aggravated circumstances." Section 32A-4-28(B)(2)(a), (b).

**{41}**    Section 32A-4-28(B)(2) does not enumerate the specific methods of assistance that are sufficient to constitute reasonable efforts, beyond stating that the efforts should be

12

directed to assist the parent in remedying the conditions and causes of neglect and abuse. That being the case, we have traditionally considered the totality of the circumstances when reviewing the district court's determination. *See State ex rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 59, 366 P.3d 282; *Patricia H.*, 2002-NMCA-061, ¶ 31. Efforts to assist a parent "may include individual, group, and family counseling, substance abuse treatment, mental health services, transportation, child care, and other therapeutic services." *Patricia H.*, 2002-NMCA-061, ¶ 26. As our Court of Appeals has noted, "[w]hat constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Id.* ¶ 23.

{42}   The district court's consideration of Child's health and safety does not relieve the Department of the statutory requirement that reasonable efforts be made. *See id.* ¶ 21. When examining whether the Department's efforts were reasonable in this case, we find it helpful to look to the distinction our Court of Appeals has drawn between "active" efforts and "passive" efforts in other termination cases. *See State ex rel. Children, Youth & Families Dep't v. Yodell B.*, 2016-NMCA-029, 367 P.3d 881. In cases where the Indian Child Welfare Act (ICWA) applies, a showing of *active* efforts on the part of the Department is required before a parent's parental rights may be terminated. *Id.* ¶ 8. The Court of Appeals has distinguished active efforts from passive efforts, determining that "active efforts connotes a more involved and less passive standard than that of reasonable efforts." *Id.* ¶ 20 (internal quotation marks and citation omitted). The Court of Appeals describes the distinction as follows:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . is where the state [PPW] takes the client through the steps of the plan rather than requiring that the plan be performed on its own.

*Id.* ¶ 17 (internal quotation marks and citation omitted). "The term active efforts, by definition, implies heightened responsibility compared to passive efforts. Giving the parent a treatment plan and waiting for [the parent] to complete it would constitute passive efforts." *Id.* (quoting *In re A.N.*, 2005 MT 19, ¶ 23, 325 Mont. 379, 106 P.3d 556). "[A]ctive efforts requires more than pointing the parent in the right direction, it requires 'leading the horse to water.'" *Yodell B.*, 2016-NMCA-029, ¶ 17 (internal quotation marks and citation omitted).

**B.    The District Court's Determination That the Department Made Reasonable Efforts to Assist Father Is Supported by Substantial Evidence**

{43}   In this case, the Department's efforts, although imperfect, were reasonable. *See Patricia H.*, 2002-NMCA-061, ¶ 28 ("[O]ur job is not to determine whether [the Department] did everything possible; our task is . . . to [determine] whether [the Department] complied with the minimum required under law."). In the beginning months of the case, the

13

Department prepared a treatment plan for Father, went over the treatment plan with Father, provided Father with the Department's contact information, and scheduled appointments for Father's psychosocial assessment. Father did not show up for the appointments and did not participate in the psychosocial assessment.

**{44}**   The district court heard testimony that Father was taken into custody in either October or November 2013. This means that Father was not incarcerated for the first seven or eight months of this case; that is, March 2013 to October/November 2013. Father was present at the custody hearing on March 7, 2013 and the mediation conference and plea hearing on April 5, 2013, was made aware of his treatment plan, and was provided the Department's contact information. But Father never contacted the Department when he was out of custody during the first several months of the case or during any other period of time when he was out of custody. The same is true for the time Father was incarcerated; he made no attempts to contact the Department.

**{45}**   The Department's senior PPW, Mr. Gaczewski, has been personally and intimately involved with this case since Child was taken into the Department's custody on February 21, 2013. He served as Child's PPW from March 2013 to November 2014 and served as Father's PPW from March 2014 to November 2014. For almost two years, Mr. Gaczewski served a critical role in this matter and, having done so, was able to testify to Father's lack of participation in the case from its inception.

**{46}**   Mr. Gaczewski's continuous involvement in the case may have provided the district court with the nexus it needed to gain a broader understanding of the Department's efforts to assist Father. Although the picture of the Department's efforts is by no means perfectly complete, Mr. Gaczewski's testimony, even without the testimony of Father's first PPW, Ms. Drobiniski, appears to have been adequate to fill any questionable void. If not, however, when the termination of parental rights hearing resumed on February 6, 2015, the court heard from Mr. Gaczewski about his additional efforts to assist Father while the court was in recess. There is no reason why the court could not consider these additional efforts when determining whether the Department's efforts as a whole were reasonable.

**{47}**   Six days after the first day of the termination of parental rights hearing, the Department sent a letter to Father along with the psychosocial assessment and self-addressed, stamped envelopes. When Father returned the psychosocial assessment, the Department prepared a comprehensive treatment plan for Father and sent Father a letter detailing the ways Father could comply with the plan while in custody. Father never responded to the Department or acknowledged the treatment plan. Even after the Department sent follow-up letters, Father did not respond. Father only sent letters to Child.

**{48}**   Both the Department and Father are responsible for making efforts toward reunification of the family. *See* § 32A-4-22(C) (2009, amended 2016) ("[T]he court shall . . . order the [D]epartment to implement and the child's parent . . . to cooperate with any treatment plan approved by the court."). While we acknowledge that Father finally

completed the psychosocial assessment, Father has continuously failed to show any desire or willingness to address the conditions and causes that brought Child into custody. Father never contacted the Department, he missed or canceled scheduled appointments with the Department, and he only visited Child once or twice at the beginning of the case.

**{49}** Around the time of the plea hearing in April 2013, Father was homeless and did not have an address. Although Father had been instructed by the court to maintain regular contact with his attorney and the Department, he did not do so. When Father failed to attend the initial judicial review hearing on May 20, 2013, Father's attorney informed the court that she did not know why Father was not in court and volunteered that when she had spoken with Father the day before, Father stated that he had not been in touch with the Department, he had not begun to engage in his treatment plan, and he was only looking for a job. Later, at the initial permanency hearing on November 25, 2013, Father's attorney again informed the court that Father had not kept in touch with her, contrary to the court's instructions.

**{50}** Father was given another chance during the recess of the termination hearing to show his willingness to work with the Department on a treatment plan and declined to participate in any meaningful way. Although the new treatment recommendations proposed by the Department were not yet approved by the district court, the delay in formulating a more comprehensive treatment plan could be attributed to Father's lack of initiative in participating in the psychosocial assessment at the outset. The record indicates that the Department made reasonable efforts to assist Father, but Father did not take advantage of those efforts.

**{51}** We do acknowledge that there are some conflicts in the testimony of Mr. Gaczewski and Father, specifically those pertaining to the dates Father was in and out of custody and Ms. Drobinski's visit to Father at MDC in November of 2013. Based on the evidence presented at the termination hearing, the district court could have concluded that Mr. Gaczewski was a more credible witness than Father. It is not our job to assess the credibility of witnesses; it is our duty to defer to the district court's conclusions in this regard. *See Vanessa C.*, 2000-NMCA-025, ¶ 24.

**{52}** When making a determination as to whether the Department's efforts to assist Father were reasonable, the district court was required to consider Child's health and safety. *See* § 32A-4-22(C) (2009, amended 2016) ("Reasonable efforts shall be made to preserve and reunify the family, with the paramount concern being the child's health and safety."); § 32A-4-28(A) ("In proceedings to terminate parental rights, the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated."). Throughout the course of the proceedings in this case, Child's guardian ad litem, Karen Cantrell, testified to Child's extensive injuries and the highly specialized care that Child would need for the rest of her life. At the termination hearing, Ms. Stordahl testified to the numerous therapies Child had been receiving and the continued treatments that would be required to keep her alive. As was the case in *Patricia H.*, "[t]he testimony raised significant questions regarding

15

[Father's] present ability to meet Child's specialized needs." 2002-NMCA-061, ¶ 33 (affirming termination of mother's parental rights where child had specialized needs requiring a high level of care and mother stopped participating in services). Indeed, the district court expressed concern that Father had not shown any interest or initiative in learning about Child's needs and had not obtained any training on how to care for Child.

**{53}** Aside from a reasonable efforts determination, the district court was also required under Section 32A-4-28(B)(2) to determine whether the conditions and causes of the neglect and abuse were unlikely to change in the foreseeable future. "Foreseeable future" means "a reasonably definite time or within the near future." *Patricia H.*, 2002-NMCA-061, ¶ 34 (internal quotation marks and citation omitted). The court found, based on Father's lack of performance in the past two years, that Father would not realistically be able to care for Child. The court also considered the fact that Father was currently incarcerated on criminal allegations of abuse stemming from the case at hand, with no anticipated release date.[4] *See Patricia H.*, 2002-NMCA-061, ¶ 34 ("[I]n balancing the interests of the parents and children, the court is not required to place [Child] indefinitely in a legal holding pattern." (internal quotation marks and citation omitted)).

**{54}** Because of Child's highly specialized needs and Father's inability to meet those needs in the near future, as well as Father's failure to maintain contact with Child and the Department, the district court determined that termination was in Child's best interest. In addition to finding that the Department made reasonable efforts to assist Father, the court found that Father did not "substantially comply with his court-ordered treatment plan and was not successful in addressing his issues with substance abuse, housing and mental health." We will not disturb the district court's findings.

## IV.    CONCLUSION

**{55}** Considering the totality of the circumstances, there was substantial evidence for the district court to find that the conditions and causes of Child's neglect and abuse were unlikely to change in the foreseeable future despite reasonable efforts by the Department under Section 32A-4-28(B)(2). The Court of Appeals usurped the role of the district court by reweighing the evidence and failing to give deference to the district court's determinations. Therefore, we reverse the opinion of the Court of Appeals, affirm the district court order terminating Father's parental rights, and remand for proceedings consistent with this opinion.

**{56}    IT IS SO ORDERED.**

_____

[4]Father subsequently pled no contest to four counts of child abuse in the criminal matter. *See* Case No. D-202-CR-2014-00244.

16

**PETRA JIMENEZ MAES, Justice**

WE CONCUR:

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**CHARLES W. DANIELS, Justice**

**BARBARA J. VIGIL, Justice, specially concurring**

**GARY L. CLINGMAN, Justice, not participating**

**VIGIL, Justice (specially concurring).**

**{57}** I agree with the majority that substantial evidence supported the termination of parental rights. The totality of the circumstances sustained the district court's eventual determination that the Department made reasonable efforts to assist Father under Section 32A-4-28(B)(2). Respectfully, I write separately to underscore three points. First, a parent's recalcitrance does not in itself relieve the Department from the responsibility to render reasonable efforts. *See* maj. op. ¶ 48. Second, passive efforts are not reasonable efforts under Section 32A-4-28(B)(2). *Contra* maj. op. ¶ 42. Third, the Department must do more than it did in this case to assist a parent who is incarcerated in order to meet its statutory responsibility under Section 32A-4-28(B)(2).

**{58}** First, the district court cannot terminate parental rights unless it finds that the Department made "reasonable efforts . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." Section 32A-4-28(B)(2). The methods of assistance required to support a finding of reasonable efforts vary with the facts and circumstances of the case. *Patricia H.*, 2002-NMCA-061, ¶¶ 23, 26. Although the totality of the circumstances may be considered in establishing reasonable efforts, including "the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting," Section 32A-4-28(B)(2) requires the Department to provide the parent with a reasonable and appropriate level of support under the individual circumstances. *See Patricia H.*, 2002-NMCA-061, ¶¶ 23, 26, 31. This requires ongoing efforts to engage the parent in a way that will reasonably enable the parent to adjust the causes and conditions that led to the abuse and neglect of the child. *See* § 32A-4-28(B)(2).

**{59}** In this case, the district court could have concluded that Father was uncooperative when the Department initiated reasonable efforts to engage him and Father did not respond. *Patricia H.*, 2002-NMCA-061, ¶ 23. It must be noted, however, that parental cooperation is but one circumstance informing whether the Department made reasonable efforts. *See id.*

17

A lack of engagement on the part of the parent does not authorize the Department to abandon its ongoing responsibility to reach out to the parent to render assistance. This would be contrary to the statute, under which the Department may be relieved from its statutory responsibility based only upon a showing that further efforts would be futile or the child has been subjected to aggravated circumstances. *See* § 32A-4-28(B)(2)(a)-(b); *see also* NMSA 1978, § 32A-4-29(I) (2009) (providing that the exceptions must be proven by clear and convincing evidence). The Department may not circumvent these statutory requirements with a posthoc claim that a parent was uncooperative after failing to make reasonable efforts in the first place. Absent a finding of futility or aggravating circumstances, the Department's statutory responsibility remains in place.

**{60}**     Reasonable efforts is a mandatory predicate to the termination of parental rights, and reflects a legislative determination that when there are grounds for a child to be taken into custody, the Department is required to make efforts to assist the parent. *See Patricia H.*, 2002-NMCA-061, ¶ 21. While reunification may ultimately turn on a parent's success in treatment, it is the Department's responsibility to initiate and continually pursue communication and efforts to assist the parent in treatment. *See* Section 32A-4-28(B)(2). These efforts are a component of due process and consistent with the fundamental nature of parental rights. *Marlene C.*, 2011-NMSC-005, ¶ 37; *see also Santosky*, 455 U.S. at 747, 769.

**{61}**     Second, "reasonable efforts" is an affirmative responsibility, not a passive one. The majority implies that passive efforts may suffice for reasonable efforts, citing *Yodell B.*, 2016-NMCA-029, ¶ 17. In *Yodell B.*, however, the Court of Appeals considered whether there was substantial evidence to support a finding that the Department made *active efforts* to assist a parent. *Id.* ¶ 1. "Active efforts" is an independent statutory directive arising under the Indian Child Welfare Act, 25 U.S.C. § 1912(d) (ICWA). In *Yodell B.*, the Court of Appeals distinguished "active efforts" from "passive efforts," a term other states have used in construing the ICWA,[5] and explained that "active efforts connotes a more involved and less passive standard than that of reasonable efforts." 2016-NMCA-029, ¶ 20 (citing *In re C.D.*, 2008 UT App 477, ¶ 34, 200 P.3d 194). The Court of Appeals did not conclude that passive efforts are sufficient to fulfill New Mexico's reasonable efforts requirement, and this Court does not do so here.

**{62}**     Neither "active" nor "passive" efforts are the equivalent of "reasonable" efforts under

---

[5]*Yodell B.*, 2016-NMCA-029, ¶ 17 (citing *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999); *In re Welfare of Child of E.A.C.*, 812 N.W.2d 165, 174 (Minn. Ct. App. 2012); *In re A.N.*, 2005 MT 19, ¶ 23, 325 Mont. 379, 106 P.3d 556; *In re J.S.*, 2008 Okla. Civ. App. 15, ¶ 16, 177 P.3d 590); *but see In re Michael G.*, 63 Cal. App. 4th 700, 714 (1998) (noting that while state law did not require "active efforts," "[e]ach reunification plan must be appropriate to the parent's circumstances. The plan should be specific and internally consistent, with the overall goal of resumption of a family relationship." (citation omitted)).

18

Section 32A-4-28(B)(2). These standards are separate and distinct from the requirement that the Department make reasonable efforts to assist a parent. By contrast, reasonable efforts are efforts tailored to the circumstances of a case. And under all of these standards, the Department must develop a treatment plan directed to assist the parent in his or her specific circumstances and individualized needs. *See Yodell B.*, 2016-NMCA-029, ¶ 17.

{63}	Third, the Department's responsibility to render assistance does not cease because a parent is incarcerated. To the contrary. The Department must refrain from pursuing a termination of parental rights on the sole basis that a parent is incarcerated. Section 32A-4-28(D). As stated, Section 32A-4-28(B)(2) requires the Department to render individualized support. Therefore, when a parent is in jail, the Department must do more to assist the parent, as the parent is limited in his or her ability to appear at the Department to receive information and support. *See, e.g.*, *State ex rel. Children, Youth & Families Dep't v. William M.*, 2007-NMCA-055, ¶¶ 27, 68-71, 141 N.M. 765, 161 P.3d 262; *Hector C.*, 2008-NMCA-079, ¶ 26.

{64}	In other cases involving incarcerated parents, the Department has diligently and intentionally fulfilled its responsibility by maintaining contact with the parent and the parent's counsel; calling and visiting the parent in jail; bringing an interpreter to the jail to assist the parent in completing a psychosocial assessment; arranging visits between the parent and child at the jail; and following up on the parent's request to complete a home study of relatives who lived out of state. *William M.*, 2007-NMCA-055, ¶¶ 68-71; *Hector C.*, 2008-NMCA-079, ¶ 26.

{65}	The Department knew Father was incarcerated in this case and visited Father in jail in November 2013. *See* maj. op. ¶ 21. Yet, for reasons that are not explained, the Department did not assist Father with his psychosocial assessment at that time. *Id.* The Department did not contact Father until the first day of the termination hearing on August 27, 2014, and the psychosocial assessment remained pending. *See id.* ¶¶ 22, 26. At the hearing, Mr. Gaczewski testified that he was unaware that Father was still in jail and had been unsuccessful in locating Father on the jail website. *See id.* ¶ 22. Not until the nearly sixth-month recess between the first and second days of the termination hearing did the Department mail the psychosocial assessment to Father, who completed it forthwith. *Id.* ¶ 29. Only then did the Department proceed to develop an individualized treatment plan. *Id.*

{66}	Although the precise dates of Father's incarceration are unclear from the record, what is clear is that the Department knew Father was incarcerated in November 2013 and failed to assist Father in completing the psychosocial assessment at that time. Maj. op. ¶ 21. In other cases, the Department has assisted incarcerated parents with the psychosocial assessment, and the Department offered no explanation for why it did not do so in this case. *See, e.g.*, *William M.*, 2007-NMCA-055, ¶¶ 27, 69; *Hector C.*, 2008-NMCA-079, ¶ 26. The failure to do so was not reasonable and left to speculation how Father would have otherwise progressed in treatment, particularly given that he promptly completed the psychosocial

assessment when provided with it. *Keon H.*, 2017-NMCA-004, ¶¶ 11, 16-17.

**{67}**     In conclusion, I agree that the totality of the circumstances supported a finding that the Department made reasonable efforts to address the causes and conditions of abuse and neglect. The Department initiated efforts to engage Father and renewed its efforts during the recess between the first and second day of the termination hearing. *See* maj op. ¶ 29. However, I write separately to clarify that Father's recalcitrance did not relieve the Department from its statutory responsibility; passive efforts are not reasonable efforts under Section 32A-4-28(B)(2); and the Department should have done more to assist Father while he was incarcerated.

_____

**BARBARA J. VIGIL, Justice**