2002-NMCA-061

47 P.3d 859

**STATE of New Mexico ex rel. CHILDREN, YOUTH & FAMILIES DEPARTMENT, Petitioner–Appellee,**

**In the Matter of Elizabeth H. a/k/a Elizabeth Kelly H., A Child, and concerning Patricia H. a/k/a Patricia K. W., Respondent–Appellant.**

**No. 21,913.**

Court of Appeals of New Mexico.

March 21, 2002.

Certiorari Denied, No. 27,504, June 6, 2002.

Angela L. Adams, Chief Children's Court Attorney, Daniel J. Pearlman, Children's Court Attorney, Santa Fe, NM, for Appellee.

Jane Bloom Yohalem, Santa Fe, NM, for Appellant.

Walter M. Hart, III, Los Lunas, NM, Guardian Ad Litem.

*OPINION*

BOSSON, Chief Judge.

{1} Patricia H's parental rights in her child, Elizabeth (Child), were terminated by the district court, pursuant to NMSA 1978, Section 32A–4–28(B)(2) (2001). Patricia H. (Mother) contends that the record is not sufficient to support, by clear and convincing evidence, that: (1) the Children, Youth and Families Department (CYFD) made reasonable efforts to assist her in remedying the causes of her neglect of Child, and (2) further efforts would be futile. We affirm.

**BACKGROUND**

{2} CYFD took custody of Child in March of 1998, when she was 4½ years old. CYFD did so at the request of Mother who stated that she was no longer able to care for Child and expressed extreme frustration with Child's "defiant" behavior. CYFD had previously received referrals related to a lack of adequate supervision in Child's home. At the time she came into CYFD custody, Child was dirty, unkempt, and hungry. Mother pled no contest to Child being without proper parental care or control necessary to her well-being, and a stipulated judgment was entered on May 27, 1998, pursuant to NMSA 1978, Section 32A–4–2(C)(2) (1997), *amended by* NMSA 1978, Section 32A–4–2(E)(2) (1999).

{3} At the time Child was taken into CYFD custody, Mother was experiencing serious health problems, including a thyroid disorder, which reportedly caused her to be unusually irritable. Shortly thereafter, Mother was diagnosed with breast cancer, and underwent a mastectomy in April 1998, followed by a course of radiation therapy, which was completed in July 1998. A psychological evaluation of Mother was completed in June 1998, and CYFD developed a treatment plan based on that evaluation.

{4} During the first three months that Child was in CYFD custody, CYFD arranged visits between Child and Mother, but Mother did not engage well with Child at that time. Mother had little contact with Child between June and December of 1998. In October 1998, Mother was hospitalized twice for additional surgeries related to her mastectomy, and subsequently received home-based support and case management services until February 1999.

{5} Following a permanency hearing on December 7, 1998, the court found that Mother had made some efforts to comply with treatment, but ordered that Child was to remain in CYFD custody until further order of the court. The permanency plan at that time was for Child eventually to return home with Mother. The CYFD treatment plan included goals related to improving Mother's parenting skills, and called for individual therapy for Mother, as well as work with Child's therapist. The treatment plan was incorporated by reference into the court's order.

{6} Between December 1998 and January 1999, Mother and Child were seen jointly by a therapist, Ms. Krauss, who halted this course of treatment after only five sessions. Ms. Krauss was highly unsatisfied with Mother's efforts to engage Child and felt the sessions had become detrimental to Child. Ms. Krauss believed that Mother had a schizoid personality disorder, concluded that treatment of Mother's parenting deficits would be futile, and recommended that Mother's parental rights be terminated. In February 1999, CYFD terminated Mother's visitation rights with Child, based largely on Ms. Krauss's impressions, as well as the observations of the CYFD social worker and Child's foster mother. Mother's visitation rights with Child were never reinstated thereafter.

{7} During the month following the sessions with Ms. Krauss, a CYFD social worker offered to arrange a bonding study and parenting training for Mother. Mother did not agree to these services at the time, due to CYFD's policy of forwarding previous records, including the report done by Ms. Krauss, to any new providers. Mother disagreed with the Krauss report and did not want it forwarded.

{8} In January 1999, Dr. Snyder, a Board-certified family psychologist at the Veteran's

Administration who had been seeing Mother for individual therapy, offered to meet jointly with Mother and Child to work on parenting issues. Dr. Snyder suggested that the success of such treatment should be evaluated independently by another professional and not by him. He believed it could impede the development of a therapeutic relationship with Mother and Child if he were asked to testify as to whether Child should be returned to Mother. CYFD did not respond to Dr. Snyder's offer. Nonetheless, Mother pursued individual therapy with Dr. Snyder, which included work on interpersonal issues and parenting skills.

{9} After the sessions with Ms. Krauss, and Mother's failure to cooperate in the CYFD referrals for a bonding study and parenting classes, CYFD requested a second permanency hearing seeking to change the permanency plan to a termination of parental rights. Following the hearing, which began in March 1999, and continued to May 1999, the court decided not to terminate Mother's parental rights at that point because the court was not persuaded that further efforts to treat Mother would be futile. The court ordered CYFD to "make referrals as appropriate" in an effort to continue to implement the treatment plan, which called for individual therapy, parenting education, and work with Child's therapist. Child's guardian ad litem objected to any resumption of visitation with Child until it could be determined that Mother had made sufficient progress that the visits would not cause emotional harm to Child.

{10} At a status conference in July 1999, Mother asked the court to permit visitation and postpone a termination of parental rights (TPR) hearing, which had been scheduled for August 1999. The court agreed to the postponement and stated that it was "not going to order [CYFD] to cease their efforts in assisting Ms. [H]." Instead of ordering visitation, the court indicated that it would like Mother and Child to be seen together by an expert to "see how things [were] progressing."

{11} Another status conference was held in August 1999. Mother reported that her therapy with Dr. Snyder was progressing well and requested that she be allowed to arrange some form of parenting training that involved contact with Child. CYFD objected to any contact between Mother and Child because of Ms. Krauss's earlier impressions, as well as the well-founded concerns of both the foster mother and the guardian ad litem about the potential effects of such contact on Child. The court adopted CYFD's suggestion that a bonding study be conducted by a Rule 11–706 NMRA 2002 expert (Rule 706 expert) before resuming contact between Mother and Child. The court's understanding was that the Rule 706 expert would observe Mother and Child in a "controlled environment" to "see how they interact with each other." The court stressed that this evaluation should be conducted by "someone that is available to get on this as soon as possible." Mother did not object to this course of action.

{12} In October 1999, Dr. Kenney, a Rule 706 expert, was appointed to evaluate Child's needs, the potential damage of removing Child from her foster home, and Mother's ability to parent and form a bond with Child. However, Dr. Kenney's report was delayed because of an unforeseen surgery, and the report was not submitted until March 2000.

{13} In February 2000, there was a brief hearing to extend CYFD's jurisdiction. The order that issued from this hearing indicated that the Rule 706 expert's report was still pending. Although CYFD did indicate at the hearing that it would continue to refer Mother to programs as she requested, the treatment plan, which was adopted by the court's order, stated that there was "no active treatment plan" for Mother.

{14} The court conducted a termination hearing in August 2000. At the termination hearing, Dr. Kenney testified that Child meets the diagnostic criteria for reactive attachment disorder (RAD), attention deficit hyperactivity disorder (ADHD), and oppositional-defiant disorder. Because of these conditions, particularly RAD which is common in children who have been neglected, Child needs a very high level of care, supervision, and stability. Dr. Kenney testified that it could be traumatic to Child to be removed from her foster parents because she

has bonded with them and has come to view them as her "psychological parents." Dr. Kenney cautioned that any change is difficult for Child because her diagnosis make her much less resilient than other children.

{15} Although Dr. Kenney met once with Mother, and also saw Child individually, he did not conduct a bonding interview with Mother and Child because of the length of time that had elapsed since Mother and Child had been in contact. Dr. Kenney felt that the results of any such bonding interview would be inconclusive.

{16} Dr. Kenney cautioned that, if the court were to order Child returned to Mother, any reintroduction should not be sudden. He emphasized the need for a carefully monitored "easing in" process, including specialized counseling. Dr. Kenney testified that he "[could] not imagine it taking less than a year" to complete a process of gradual reintroduction, including about three to six months of preparing Mother to begin visitation with Child, and then about six months of supervised visitation. We reject as inaccurate CYFD's representations to this Court, at oral argument and in its briefing, that it would take at least a year for Mother even to be ready for preliminary visits with Child. Dr. Kenney did not so testify.

{17} Dr. Kenney believed that Mother could probably care for a normal child, but felt she was weak in the personality skills that would be required to deal with Child's specialized needs. Dr. Kenney characterized the difficulties that Ms. Krauss observed between Mother and Child as being "longstanding interactional problems." He stated that change was possible, with sufficient professional intervention, although there was no guarantee that Mother would be able to develop the necessary skills. Unlike Ms. Krauss, Dr. Kenney did not believe that Mother met the criteria for any psychiatric diagnosis.

{18} Given Child's specialized needs, Dr. Kenney was surprised that Child had not been placed in therapeutic foster care, but noted that she was fortunate to have been placed with foster parents who are naturally adept at meeting her needs. Subsequently, the Child's psychologist testified that the fos-

ter parents had been receiving specialized instruction in parenting a RAD child. Mother, however, received no such instruction. Dr. Kenney clarified that this was "not a parenting contest," but nevertheless discussed Mother's "limitations" in contrast with the high skill level demonstrated by Child's foster parents.

{19} Mother's therapist, Dr. Snyder, testified that Mother's therapy had progressed well, and that they had been addressing parenting issues to the extent possible in individual therapy. Dr. Snyder described Mother as an eccentric person with a "crusty demeanor" and a tendency to "shut down" when she is feeling defensive, but stated that he had observed improvements in her interpersonal skills, as well as a decreased level of defensiveness.

{20} At the conclusion of the hearing, the court terminated Mother's parental rights in Child, pursuant to Section 32A–4–28(B)(2).

**DISCUSSION**

{21} Before parental rights may be terminated, New Mexico law requires that CYFD demonstrate, by clear and convincing evidence, that a child has been neglected or abused as defined by Section 32A–4–2. CYFD must also establish that the "causes of the neglect or abuse are unlikely to change in the foreseeable future, *despite reasonable efforts* by [CYFD] to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." Section 32A–4–28(B)(2) (emphasis added). Finally, CYFD must show that the best interests of the child are served by the termination of parental rights. Section 32A–4–28(A). However, the termination of parental rights cannot be based on a best interests determination alone. *See In re Adoption of J.J.B.*, 119 N.M. 638, 651–53, 894 P.2d 994, 1007–09 (1995). "The fact that a child might be better off in a different environment is not a basis for termination of parental rights in this state." *In re R.W.*, 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct.App.1989); *see also State ex rel. Children, Youth & Families Dep't v. Ruth Anne E.*, 1999–NMCA–035, ¶ 10, 126 N.M. 670, 974 P.2d 164 (stating that parenting is a fundamental liberty inter-

est). The statutory prerequisite of reasonable efforts to assist the parent must be satisfied before parental rights may be terminated. "Once extraordinary circumstances are shown by clear and convincing evidence, the court should *then* make a determination based on the best interests of the child." *Id.* at 653, 894 P.2d at 1009 (emphasis added).

{22} We must determine whether substantial evidence supports the trial court's decision. *In re Ernesto M., Jr.,* 1996–NMCA–039, ¶ 15, 121 N.M. 562, 915 P.2d 318. " 'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion.' " *State v. Gonzales,* 2001–NMCA–025, ¶ 40, 130 N.M. 341, 24 P.3d 776. Our role is to determine whether the fact finder could properly conclude that the proof requirement below was met. *In re Termination of Parental Rights of Eventyr J.,* 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995) ("Our standard of review is therefore whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing standard was met."). In this case, viewing the evidence in the light most favorable to the judgment, we will evaluate whether the trial court could have found by clear and convincing evidence the necessary statutory conditions to termination. *Gonzales,* 2001–NMCA–025, ¶ 40, 130 N.M. 341, 24 P.3d 776; *State ex rel. Children, Youth & Families Dep't v. Patricia N.,* 2000–NMCA–035, ¶ 10, 128 N.M. 813, 999 P.2d 1045.

**CYFD's Efforts to Assist Mother**

{23} What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting. For example, in *State ex rel. Children, Youth & Families Dep't v. Tammy S.,* 1999–NMCA–009, ¶ 15, 126 N.M. 664, 974 P.2d 158, we held that the "[f]ather's transience, failure to communicate, and lack of cooperation rendered [CYFD's] efforts sufficient." In that case, we affirmed a futility finding where a father was arrested twice

for violent crimes, failed to establish a stable residence, and did not participate in the domestic violence counseling, alcohol treatment, or psychological evaluation recommended by CYFD. *Id.* ¶ 14. In *State ex rel. Children, Youth & Families Dep't v. Vanessa C.,* 2000–NMCA–025, ¶¶ 8–9, 29, 128 N.M. 701, 997 P.2d 833, we affirmed a finding of futility where, after two years with only limited progress, a mother continued to use drugs, commit crimes, and choose partners who committed acts of domestic violence.

{24} The duration of what constitutes reasonable efforts has changed considerably over the past several years, as CYFD has truncated the length of time it renders assistance to parents. *Compare In re Termination of Parental Rights of Eventyr J.,* 120 N.M. at 469–70, 902 P.2d at 1072–73 (describing CYFD's reunification efforts, over a *five year* period, where mother was diagnosed with a personality disorder, had neglected her children and repeatedly exposed them to drug abuse and domestic violence); *State ex rel. Human Servs. Dep't v. Penny J.,* 119 N.M. 328, 329–30, 890 P.2d 389, 390–91 (Ct. App.1994) (describing CYFD's efforts, over a period of *five years,* to assist mother, who was diagnosed with a personality disorder and borderline intellectual functioning); *In re Termination of Parental Rights of Reuben & Elizabeth O.,* 104 N.M. 644, 646, 725 P.2d 844, 846 (Ct.App.1986) (describing CYFD's extensive efforts to provide assistance, over a period of approximately *six years,* to parents who had a long history of drug abuse and criminal activity), *with Vanessa C.,* 2000–NMCA–025, ¶¶ 8–9, 29, 128 N.M. 701, 997 P.2d 833 (affirming termination of parental rights where mother, after *two years,* had made some progress but continued to use drugs and engage in criminal activity); *Tammy S.,* 1999–NMCA–009, ¶¶ 2–10, 126 N.M. 664, 974 P.2d 158 (affirming termination of parental rights and concluding that trial court did not err in finding further reunification efforts futile where, after a period of about *a year and a half,* father was arrested twice, remained transient, and did not participate in the treatment recommended by CYFD).

{25} Changes in federal legislation have unquestionably had an impact on what is regarded as a reasonable effort. *See generally* Cristine H. Kim, *Putting Reason Back Into the Reasonable Efforts Requirement in Child Abuse and Neglect Cases,* 1999 U. Ill. L.Rev. 287. In 1980, Congress passed the Adoption Assistance and Child Welfare Act (AACWA), 42 U.S.C. §§ 670–79 (1994 & Supp. V 1999), which provided that states would receive federal funding for their child welfare programs if they made reasonable efforts to prevent the removal of children from their homes, and to reunify families whenever possible; *see also* 42 U.S.C. §§ 620–28; Kim, *supra,* at 289–96. Following the promulgation of AACWA, the number of children in foster care actually began to increase, as an emphasis on trying to reunify families resulted in children being kept in foster care for longer periods of time. *See* Kim, *supra,* at 291–96.

{26} In 1997, Congress passed the Adoption and Safe Families Act (ASFA), which encourages states to move more quickly to terminate parental rights and gives states a financial incentive to increase the number of adoptions. *See* Pub.L. No. 105–89, 111 Stat. 2115 (1997) (amending AACWA) (codified as amended in scattered sections of 42 U.S.C.); Kim, *supra,* at 309–10. ASFA also clarifies that states are not required to make reunification efforts for an indefinite period of time. ASFA describes "time-limited reunification services" as those provided within a *fifteen-month* period following the placement of a child into foster care, and provides federal funding for this time-limited assistance. *See* 42 U.S.C. §§ 629a(a)(7)(A), 629a(b) (1994 & Supp. V.2000). These services may include individual, group, and family counseling, substance abuse treatment, mental health services, transportation, child care, and other therapeutic services. *See* 42 U.S.C. § 629a(a)(7)(B). ASFA has had a significant impact upon the State's responsibility to provide services to children and families, which consequently informs our contemporary understanding of what constitutes a reasonable effort to assist a parent before the State may resort to termination. The fifteen-month period described in ASFA for "time-limited reunification services" provides us some guidance in how we assess the duration of reasonable efforts under state law. In so doing, we must keep in mind that the use of such a guideline needs to remain flexible and must be harmonized with the requirements of state law. We now turn to the efforts provided by CYFD.

{27} The initial services provided mother were clearly reasonable. During the first few months of Child's CYFD placement, while Mother was grappling with a major medical illness, CYFD appropriately arranged for visitation between Mother and Child, and provided Mother with a psychological evaluation. In late 1998 and early 1999, Mother was provided with transportation assistance and home-based services. CYFD provided Mother the initial five sessions with Ms. Krauss which ended in January 1999 and, shortly thereafter, offered her referrals for a bonding study and parenting training, which she refused. Mother may have had what she considered to be good faith reasons for her refusal, but CYFD is only required to make reasonable efforts, not efforts subject to conditions unilaterally imposed by the parent.

{28} Subsequently, at the second permanency hearing, in mid-1999, the court ordered CYFD to continue to implement the treatment plan by providing referrals as appropriate. Aside from two "courtesy" visits by the social worker, the record does not show that CYFD provided Mother with any assistance after February of 1999 (six months *before* the second permanency order). Mother makes much of this lack of assistance, arguing in effect that CYFD gave up on her too soon. Mother has a point that CYFD might have done more to help her during the latter period, particularly with the kind of interactive treatment with her Child that she needed. However, our job is not to determine whether CYFD did everything possible; our task is limited by our statutory scope of review to whether CYFD complied with the minimum required under law. We conclude, albeit with some hesitation, that it did.

{29} Following the second permanency order, CYFD was somewhat constrained in

what it could do. There were legitimate concerns about the deleterious effect that contact with Mother could have on Child, arising from CYFD's earlier unsuccessful attempts to work jointly with Mother and Child. The court agreed, and the record supports its conclusion, that visitation should be delayed until an expert could be present to determine whether Mother had made sufficient progress through her own therapy, so that such contact would not be harmful to Child. Although the court ordered the 706 expert to move expeditiously and conduct a bonding study to determine whether things had progressed enough so that parent-child contact could be resumed, the report was delayed until so much time had elapsed that the expert felt a bonding study would be pointless. That conclusion was never challenged by Mother below.

{30} Although Mother did not have the opportunity to be seen jointly with Child to address the interactional problems and parenting deficits previously observed by Ms. Krauss, it was not CYFD that stood in her way. The evidence shows quite clearly that Child is unusually fragile and requires highly skilled parenting. Mother has parenting deficits that apparently coincide with those precise areas in which Child's needs are most acute. Mother rebuffed CYFD's earlier efforts at a bonding study. Later, CYFD followed the court's instructions. After the second permanency order, CYFD's responsibility was largely limited to arranging referrals. Mother has not pointed to any referrals that CYFD should have made, given the restrictions the court placed upon it while the 706 report was pending. CYFD was aware during that time that Mother's need for individual therapy was being met by Dr. Snyder at the Veteran's Administration.

{31} Our standard of review requires us to determine whether the trial court's conclusion, when viewed in the light most favorable to the decision below, was supported by substantial evidence, not whether the trial court could have reached a different conclusion. *See In re Ernesto M., Jr.,*1996–NMCA–039, ¶ 15, 121 N.M. 562, 915 P.2d 318. Considering the totality of the circumstances, the trial court could have concluded that CYFD made

reasonable efforts to assist Mother, notwithstanding the court's refusal to make a futility finding at the second permanency hearing and the lack of any CYFD assistance to Mother after that time.

### Likelihood of Change in the Foreseeable Future

{32} Before parental rights may be terminated, CYFD must demonstrate that the causes of the neglect or abuse are unlikely to change in the foreseeable future, despite the reasonable efforts of CYFD to assist the parent. Section 32A–4–28(B)(2).

{33} The testimony raised significant questions regarding Mother's present ability to meet Child's specialized needs. If a gradual reintroduction were initiated, Dr. Kenney estimated that the process would take about a year, including preparing Mother for visitation, assessing Mother's readiness, and several months of supervised visitation. Furthermore, Dr. Kenney testified that there was no guarantee that it would work.

{34} We have interpreted the term "foreseeable future" to refer to corrective change within "a reasonably definite time or within the near future." *In re Termination of Parental Rights of Reuben & Elizabeth O.,* 104 N.M. at 650, 725 P.2d at 850 (affirming termination of parental rights where expert testified that parents would require at least two years to remedy their chemical dependency issues). We have also noted that "in balancing the interests of the parents and children, the court is not required to place the children indefinitely in a legal holding pattern." *Id.*

{35} At the time of the termination hearing, Child had already been in CYFD custody for nearly two and a half years. The trial court could have reasonably concluded that another year might well be too long to wait, particularly where there was considerable doubt as to whether the wait would enable Mother to develop the necessary skills. Having determined that CYFD had made reasonable efforts, the trial court could also properly consider the potential hardship to Child, who is less resilient to change than most other children, in attempting a reintroduction process with Mother. Under these circumstances, the trial court did not act

unreasonably in concluding that change was unlikely in the foreseeable future.

{36} While affirming, we note for the record our reservations about CYFD's performance in this case. As of the summer of 1999, all parties and the court had decided to rely upon the intervention and guidance of a 706 expert. Lapse of any additional time was a significant concern to all. When the expert became ill, the report was delayed until one of its very purposes—a closely monitored interactional study of both Mother and Child together—was no longer feasible.

{37} Time became an insurmountable obstacle for Mother in this process. Without the necessary joint therapy with her Child, Mother could not prove her fitness to parent; without the 706 report, she could not obtain that therapy. By the time of the final TPR hearing, it was simply too late to change course given the extreme needs of the Child.

{38} Given the time sensitivity of this case, we are troubled by CYFD's lack of initiative from mid–1999 onward. CYFD failed to take charge of the process, to alert the court in a timely manner about unforeseen delays and their prejudicial impact upon Mother. In effect, CYFD appears to have simply let events take their course until termination was inevitable. Although, for the reasons set forth herein, CYFD may have barely satisfied the requirement of reasonable efforts, especially when considered over the entire period of its responsibility, CYFD cannot be proud of its record at the critical juncture when the process bogged down.

## CONCLUSION

{39} The decision of the district court terminating Mother's parental rights in Child is hereby affirmed.

{40} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and MICHAEL D. BUSTAMANTE, Judges.