This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37966**

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

       Petitioner-Appellee,

v.

**JALEXUS S.,**

       Respondent-Appellant,

**IN THE MATTER OF A'MAURI L. and
TE'AZIYAH S.,**

       Children.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
William E. Parnall, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

for Appellant

Carol K. Rodriguez
Albuquerque, NM

Guardian Ad Litem

**DECISION**

**MEDINA, Judge.**

**{1}** Jalexus S. (Mother) appeals the termination of her parental rights to A'Mauri L. and Te'Aziyah S. (collectively, Children). For the reasons that follow, we affirm.

**BACKGROUND**

**{2}** Mother and Children fled their home in Houston, Texas following a flood to stay with relatives in Albuquerque, New Mexico while their house was being renovated. On May 8, 2017—while Mother was residing in New Mexico—the Children, Youth and Families Department (CYFD) filed a petition alleging A'Mauri, approximately six months old at the time, and Te'Aziyah, approximately two years old at the time, were abused and neglected by Mother. According to an affidavit in support of the petition, CYFD took custody of Children following an incident where Mother left Children unattended in a running car for five to ten minutes when she went into an urgent care center, drove away afterward without properly restraining Children, and acted erratically when pulled over by police.

**{3}** The district court held an adjudicatory hearing on July 17, 2017. Based on the events that brought Children into CYFD's custody, the court found clear and convincing evidence that Mother abused and neglected Children, pursuant to NMSA 1978, Section 32A-4-2(B)(4), (G)(2) (2016, amended 2018). The court ordered CYFD to implement a court-approved treatment plan, which included, among other things: addressing any substance abuse or mental health issues by completing substance abuse and mental health assessments and following subsequent recommendations, taking random drug tests, obtaining parenting skills necessary to keep Children safe, and participating in weekly visitations with Children. The court placed Children in the legal custody of CYFD, which in turn placed Children in foster care.

**{4}** On April 5, 2018, CYFD filed a motion to terminate Mother's parental rights to Children, alleging that while Mother had completed or made efforts to complete portions of her treatment plan, she had made no progress in recognizing Children's trauma, learning appropriate parenting skills, identifying the risks her actions posed to Children, or mitigating her mental health issues. The district court set the termination hearing for June 4, 2018. Three days before the termination hearing, Mother moved to vacate and reset the hearing, arguing that it was premature in light of evidence she presented at the most recent permanency hearing demonstrating that she was making substantial progress. The district court denied Mother's motion and proceeded to hold the termination hearing over the course of two days—June 4 and June 28, 2018.

**{5}** On the first day of the termination hearing, Dr. Christopher Alexander, a clinical psychologist, testified about Mother's psychological evaluation he performed in December 2017. Mother scored high in "rigidity" on the Child Abuse Potential Inventory, which indicated that she had a rigid view regarding Children's behaviors, a low frustration tolerance for Children, and a higher likelihood to use punishment instead of consequences. Mother also discussed her substance use with Dr. Alexander as part of the assessment. Mother told Dr. Alexander that she smoked marijuana and recently tested positive for cocaine.

**{6}** Dr. Alexander diagnosed Mother with "an adjustment disorder with mild anxiety" and "an unspecified personality disorder with borderline features." He explained that individuals suffering from personality disorders with borderline features have problems with relationships, variability in their moods and self-image, and lack of a clear sense of direction. They can also be inclined to impulsivity, anger management issues, suicidal threats, and high rates of conflict with others. Because personality disorders are lifelong conditions, Dr. Alexander explained it was important for Mother to seek treatment to manage (as opposed to cure) her symptoms. While Dr. Alexander did not recommend any particular form of treatment for Mother, he noted there was a growing trend of using dialectical behavioral therapy (DBT) to treat individuals with personality disorders.

**{7}** Tiffany Matteucci, the CYFD permanency planning worker assigned to Mother's case, testified about CYFD's efforts to assist Mother, as well as Mother's compliance with her treatment plan. Early in the case, CYFD referred Mother to services in Albuquerque. After learning that Mother moved back to Houston and was travelling back to Albuquerque for weekly visitations with Children, Matteucci called Houston child protective services to set up services there. However, Matteucci never received a return call, which she speculated was a result of the recent hurricane in Houston. Consequently, Mother did not participate in any services—other than visitations in Albuquerque—from May 2017 until she moved back to Albuquerque in September 2017.

**{8}** When Mother moved back to Albuquerque, she began parenting classes at Healthy Families. CYFD also referred Mother to Healthy Families for her mental health, substance abuse, and domestic violence assessments. Additionally, CYFD referred Mother to Dr. Alexander for her psychological evaluation. As a result of Dr. Alexander's evaluation, CYFD referred her to Albuquerque Behavioral Health (ABH) in March 2018 for DBT.

**{9}** Matteucci also testified about Mother's visitation schedule with Children throughout the case. In September 2017, CYFD began observing some concerning behavior with Te'Aziyah following visits, including hitting peers and teachers at her daycare. As a result, CYFD stopped visitations until an Infant Mental Health (IMH) team could assist. Visits resumed with the IMH team in mid-October, and continued until January 2018, when Mother "pulled out of" the IMH program after receiving the results of the IMH assessment. From January to February, Matteucci or other CYFD workers supervised visits instead of the IMH team. However, CYFD again stopped all visitations

in early February out of concern for Te'Aziyah's behavior and encouraged Mother to continue working with the IMH team. Mother agreed, and visitations resumed with the IMH team in March.

{10}    Janeth Nuñez Del Prado, a licensed clinical social worker with an emphasis in infant mental health, testified about her work with Mother and Children in the IMH program. As part of the program, Mother began an IMH assessment in late September 2017. Mother eventually completed the IMH assessment in January 2018, although she missed seven out of the sixteen scheduled sessions. In addition to performing the IMH, Del Prado provided therapeutic support for visitations with Children. Through her work with Mother and Children, Del Prado noticed concerning behavior. For example, A'Mauri would have a flat-affect and regress in terms of his motor skills during visits. Te'Aziyah's behavior was especially troublesome. Te'Aziyah showed a number of symptoms consistent with trauma and met the criteria for a diagnosis of PTSD. Te'Aziyah had "intrusive symptoms" that manifested in post-traumatic play that was "repetitive and focused and very scary." For instance, she would reenact the scene of police hurting Mother on the day Children were taken into custody.

{11}    Te'Aziyah would also have nightmares and show additional distress when reminded of the traumatic events of the day Children were taken into custody. Del Prado believed Mother was a "trauma trigger." In the days following visits with Mother, Te'Aziyah would soil herself even though she was potty-trained. Additionally, beginning in April 2018, Te'Aziyah began to stutter so badly after seeing Mother that over half the things she said were unintelligible. Sometimes Te'Aziyah would have prolonged tantrums at daycare following visits, although Del Prado noted these later improved. Te'Aziyah also showed disinhibited social engagement in which she would call everyone "mommy" and ask strangers to hold her. However, Del Prado also noted these behaviors have since abated.

{12}    In terms of Mother's behavior, Del Prado noted that Mother was consistent in attending visits, "clearly loved her kids," and appeared motivated to get Children back. However, Del Prado noted some concerns. For instance, Mother struggled to read A'Mauri's distress cues and would leave him unattended in unsafe positions like on a couch or tabletop. Mother had a hard time accepting feedback and would become angry with Del Prado in front of Children. Mother had difficulty accepting responsibility for the reasons why Children were in CYFD custody, at times denying that she ever left Children in the car.

{13}    Additionally, Mother struggled to recognize and accept responsibility for the injuries that Children had when they came into custody. According to medical records, Te'Aziyah came into custody with bruising on her back and buttocks and had repeatedly stated that Mother hit her with a belt; A'Mauri had fractures in both legs. Mother denied that A'Mauri ever had any fractures or that she hit Te'Aziyah with a belt. Del Prado found this significant because parents who cannot take responsibility often have difficulty making behavioral changes because they do not believe they were ever in the wrong. Although Mother and Children made improvements throughout the case, Del

Prado still had "significant concerns" about safely returning Children to Mother within the next six months given the "slowness" of Mother's progress, "the intensity of Children's stress reaction" to Mother, and Mother's failure to consistently respond "in a parental way" to alleviate Children's stress.

**{14}** Dr. Leslie Becerra, a post-doctoral fellow at UNM and expert in clinical psychology, testified about her work on the IMH team working primarily with foster mother and Children. Dr. Becerra noticed Te'Aziyah showed different behaviors when visits with Mother had therapeutic support. In January 2018 when visits were without therapeutic support from the IMH team, Te'Aziyah would scream at and hit her peers and teachers in daycare, bite her fingernails and lips until they bled, refuse naps, and become inconsolable following sessions. Dr. Becerra also noted that Te'Aziyah would stutter, engage in baby talk, and regress in her toilet training following visitations. Conversely, Te'Aziyah's behaviors were less severe and more manageable when IMH provided therapeutic support.

**{15}** Judith Willmore, a licensed professional clinical counselor at Healthy Families, testified about her work with Mother. Willmore began working with Mother in mid-March 2018. In addition to Mother's personality disorder, Willmore thought Mother was suffering from chronic PTSD. Mother began making progress in terms of her emotional reactions once she started DBT and counseling. Although Willmore believed Mother "definitely could work to treat" her mental health issues with consistent efforts, she agreed that Mother still had "a lot more work to do."

**{16}** Mother was the only witness to testify on the second day of the termination hearing. When asked about her compliance with the treatment program, Mother stated that she takes all drug tests when asked, goes to therapeutic visits with Children, graduated from the parenting and DBT programs, and continues to go to individual counseling. However, Mother admitted that she "recently" tested positive for an anti-anxiety drug and cocaine. While Mother acknowledged Children's injuries, she stated that she did not know the cause of A'Mauri's fractures.

**{17}** Following Mother's testimony and closing arguments, the district court stated:

> [Mother has] done a lot of work recently to try to help herself, and that is commendable. And, what I have to look at is where [C]hildren are, where they started, where [Mother] is, where she started, where she could end up in six months. The idea is whether somebody could in the foreseeable future remedy what's happened and—that's where the court is having concern about the safety of [C]hildren. . . . Because [Mother's] disorder is durable, and because it's going to take a long time, her timeline . . . is not the same timeline as the federal guidelines under the Adoption and Safe Families Act [of 1997 (ASFA), Pub. L. No. 105-89, 111 Stat. 2115 (1997) (codified as amended in scattered sections of 42 U.S.C.)] require us to make a decision. . . .

The problem is that under the ASFA guidelines, [C]hildren's timetable is different—it's much faster for permanency for [C]hildren. And the evidence of trauma they received . . . indicates that they are going to need a lot of work, and that they are going to need a lot of nurturing and stability. And so the timelines for [Mother] and [Children] are different. . . . [A]nd we're required, basically, by law, by federal law, to speed up their timelines so that they are not held in a holding pattern—they won't be in foster care for a long time or forever. That's the idea, is that we don't hold them in foster care forever. . . . They need permanency.

And in terms of the best interest of [C]hildren, I have to make a hard decision . . . about whether returning [C]hildren to [Mother] within the next six months and dismissing the case would leave [C]hildren in a position where they would be safe. And from the testimony and the evidence I've heard, I don't believe that they would be.

**{18}** Accordingly, the district court found clear and convincing evidence that the conditions and causes of abuse and neglect had not been alleviated and were unlikely to change in the foreseeable future. The court also found that CYFD made reasonable efforts under the circumstances, although the court noted it "would have liked to have seen some more follow-up." Consequently, the court granted CYFD's motion to terminate Mother's parental rights to Children. The court subsequently entered extensive findings of fact supporting its ruling, which largely summarized the above testimony. In its written order, the court also found that further efforts by CYFD to assist Mother would be futile. This appeal followed.

## DISCUSSION

**{19}** Mother raises two arguments on appeal. First, Mother argues the district court premised its holding on an incorrect understanding of the ASFA's fifteen-month period. Second, Mother argues the district court failed to take into account any possible racial discrimination Mother—who is African-American—may have suffered. We address each argument in turn.

## Standard of Review

**{20}** Mother does not challenge the sufficiency of the evidence underlying the district court's termination but only what she characterizes as the district court's abuse of discretion in (1) refusing to allow her six more months to work on her treatment, and (2) failing to address any possible racial discrimination. "We will only find an abuse in the district court's discretion when its ruling is clearly against logic and effect of the facts and circumstances." *State ex rel. Children, Youth & Families Dep't v. Senaida C.*, 2008-NMCA-007, ¶ 9, 143 N.M. 335, 176 P.3d 324 (internal quotation marks and citation omitted). Additionally, "[a] district court abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *Id.* To the extent we must determine whether the district court premised its holding on a misunderstanding of the

law, our review is de novo. *See State ex rel. Children, Youth & Families Dep't v. Brandy S.*, 2007-NMCA-135, ¶ 17, 142 N.M. 705, 168 P.3d 1129 (stating that questions of law are reviewed de novo).

**The ASFA and State Law Under the Abuse and Neglect Act**

**{21}**   Mother argues the district court should have exercised its discretion to allow her six more months to continue treatment. Rather than exercise its discretion, Mother contends the district court operated under an incorrect belief that the ASFA imposes an absolute fifteen-month deadline for a parent to remedy the conditions and causes of abuse or neglect.[1] Given this incorrect understanding of law, Mother argues, the district court erroneously terminated her parental rights because it believed Mother would be unable to make the necessary progress before the ASFA's fifteen-month period was set to expire. To support her argument, Mother relies solely on the court's remarks at the conclusion of the termination hearing. Although we agree with Mother that the ASFA does not set an absolute limit on the amount of time for parents to remedy the conditions of abuse and neglect before the district court must terminate parental rights, we conclude the district court's statements do not require reversal. We explain.

**{22}**   First, the district court's remarks largely comport with the requirements for termination of parental rights under state law. "Prior to the enactment of the [ASFA], both state and federal law appeared to give primary consideration to the rights of the parents, as opposed to the welfare of their children." *State ex rel. Children, Youth & Families Dep't v. Amy B.*, 2003-NMCA-017, ¶ 7, 133 N.M. 136, 61 P.3d 845. This led to an increase in the amount of time in which child protective agencies like CYFD attempted to implement reasonable efforts before resorting to termination, which in turn increased the number of children in foster care. *See State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 25, 132 N.M. 299, 47 P.3d 859. In response to the increasing length of time children were being held in foster care, Congress passed the ASFA "to clarify that the child's health and safety is the paramount concern in determining the reasonable efforts to be made and in making those efforts . . . [and] strike a balance between the interests of family unity and health and safety." *State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 39, 421 P.3d 814. With this goal in mind, Congress passed the ASFA to "encourage[e] states to move more quickly to terminate parental rights and give[] states a financial incentive to increase the number of adoptions." *Patricia H.*, 2002-NMCA-061, ¶ 26. The ASFA accomplished this by providing funding for "time-limited reunification services," which were defined as reunification services provided "only during the [fifteen]-month period that begins on the date that the child . . . is considered to have entered foster care." 42 U.S.C. § 629a(a)(7)(A) (2012) (amended 2018). Additionally, the ASFA conditioned federal funding on states moving to terminate parental rights when a child has been in foster care for fifteen of the most recent twenty-two months. *See* 42 U.S.C. § 622(a), (b)(8)(A)(ii) (2018) (requiring states to provide assurances that the state is satisfactorily operating a "case review plan" in order to be eligible for federal funding); 42 U.S.C. §

---

[1]The parties disagree over whether Mother preserved this argument. We need not decide this issue, however, as even assuming, *arguendo*, that Mother preserved her argument, we conclude it to be without merit.

675(5)(E) (2018) (defining a "case review system" as a procedure assuring, among other things, that "in the case of a child who has been in foster care under the responsibility of the [s]tate for [fifteen] of the most recent [twenty-two] months . . . the [s]tate shall file a petition to terminate the parental rights of the child's parents [unless certain exceptions are met]").

**{23}** New Mexico followed suit, amending the Abuse and Neglect Act (ANA) to provide that "[r]easonable efforts shall be made to preserve and reunify the family, *with the paramount concern being the child's health and safety*." NMSA 1978, § 32A-4-22(C) (2009, amended 2016) (emphasis added); *see also* NMSA 1978, § 32A-4-28(A) (2005) ("In proceedings to terminate parental rights, the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child[.]"). Likewise, our state adopted the ASFA's fifteen-month timeline requirement for filing a motion to terminate parental rights.[2] *See* § 32A-4-29(H). However, our Legislature made clear that the fifteen-month period defines an upper limit to the duration of CYFD's services it may provide before moving to terminate the parent's rights, not a minimum period. *See* § 32A-4-29(A) (stating that "[a] motion to terminate parental rights may be filed at any stage of the abuse or neglect proceeding").[3]

**{24}** The district court's statements at the conclusion of the termination hearing echo the primary policy set forth within the ASFA and ANA: that is, to promote the best interests of children by attempting to minimize the amount of time that they remain in foster care. *See Keon H.*, 2018-NMSC-033, ¶ 39-40. In so doing, the district court voiced concern over Mother's mental health issues and her ability to safely parent Children within the foreseeable future. "When balancing the interests of parents and children, the court is not required to place the children indefinitely in a legal holding pattern, when doing so would be detrimental to the children's interests." *State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003-NMSC-015, ¶ 24, 133 N.M. 827, 70 P.3d 1266 (internal quotation marks and citation omitted).

**{25}** While Mother is correct that there is no bright-line requirement that the district court either terminate the parent's rights (or return the children to the parent) at the end of the fifteen-month period, there is also no requirement that the court allow a parent the

---

2Both the federal and state law considers the date that the child entered foster care as the earlier of "the date of the first judicial finding that the child has been subjected to child abuse or neglect" or "the date that is [sixty] days after the date on which the child is removed from the home." § 675(5)(F); NMSA 1978, § 32A-4-29(H) (2009).

3Mother points out that Congress recently passed the Family First Prevention Services Act (FFPSA), which removed the fifteen-month limit on federal funding for family reunification services and added federal funding for reunification services provided in the first fifteen months after the child returns home. *See* Pub. L. No. 115-123, § 50721(a), § 629a(a)(7), 132 Stat. 64, 245 (2018). Mother appears to suggest that this Court construe these recent amendments to indicate a reversal in policy from the ASFA's expedited approach, thus increasing the timeline by which CYFD should assist parents before filing a motion to terminate. In response, CYFD correctly points out that the FFPSA did not remove ASFA's requirement that states move to terminate when the child has been in foster care for fifteen of the most recent twenty-two months. *See* 42 U.S.C. § 622(a), (b)(8)(A)(ii). Nor has our Legislature removed such a requirement under state law. *See* § 32A-4-29(H). Nonetheless, as the FFPSA did not go into effect until after the district court terminated Mother's rights and Mother does not argue that it applies retroactively, we need not consider its effects on CYFD's obligations in this case.

full fifteen months before granting a motion to terminate parental rights. *See Patricia H.*, 2002-NMCA-061, ¶ 26 (stating that "the use of [the fifteen-month] guideline needs to remain flexible and must be harmonized with the requirements of state law"); *see also* § 32A-4-29(A) (stating that "[a] motion to terminate parental rights may be filed at any stage of the abuse or neglect proceeding").

**{26}**    All that is generally required for termination of parental rights under Section 32A-4-28(B)(2) is that the court find clear and convincing evidence "that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." The district court made such findings in this case, and Mother does not challenge them on appeal.[4] *See* Rule 12-318(A)(4) NMRA (requiring that the argument of the brief in chief "set forth a specific attack on any finding, or the finding shall be deemed conclusive"); *Seipert v. Johnson*, 2003-NMCA-119, ¶ 26, 134 N.M. 394, 77 P.3d 298 ("An unchallenged finding of the [district] court is binding on appeal.").

**{27}**    Moreover, even if the district court's remarks did reflect an incorrect understanding of the law, the court did not include similar language in its written findings of fact or conclusions of law. Although we may use the district court's oral remarks to clarify a written finding, such remarks may not provide the basis for reversal of that finding. *See Ledbetter v. Webb*, 1985-NMSC-112, ¶ 34, 103 N.M. 597, 711 P.2d 874 (explaining that a district court's verbal comments can be used to clarify a finding but that they cannot be the basis for reversal); *Seipert*, 2003-NMCA-119, ¶ 26 (stating that "[o]ral remarks may not be relied upon for reversal" (internal quotation marks and citation omitted)). The district court's written findings satisfy the requirements of Section 32A-4-28(B)(2). Thus, Mother's reliance on the district court's oral statements as a basis for reversal is misplaced.

**Purported Failure to Correct Racial Discrimination**

**{28}**    Mother contends the district court abused its discretion by "ignor[ing] legislative policy demanding that CYFD and our courts seek to correct any discrimination in the child protective services system . . . based on race."[5] We agree that CYFD and the district court should seek to eliminate discrimination and reduce the overrepresentation of minority children and families in foster care. *See* NMSA 1978, § 32A-1-3(E) (1993) (providing that the Children's Code should be interpreted to effectuate the legislative

---

4Mother's brief in chief does not specifically challenge the district court's findings that the conditions and causes of her neglect and abuse were unlikely to change in the foreseeable future despite reasonable efforts by CYFD. CYFD points this out, stating, "Mother does not challenge any of the findings made by the [district] court, including the . . . findings that [CYFD] made reasonable efforts to assist Mother, that additional reunification efforts would be futile, or that Mother was unlikely to adjust the conditions and causes of her abuse and neglect of Children in the foreseeable future." Mother's reply brief does not rebut this assertion.

5Mother concedes that she did not explicitly raise this issue below. The parties disagree over whether Mother nonetheless preserved this argument or whether such an argument falls within one of our exceptions to the preservation requirement. We need not decide this issue, however, as Mother fails to clearly demonstrate any error.

purpose "to reduce overrepresentation of minority children and families in the juvenile justice, family services and abuse and neglect systems through early intervention, linkages to community support services and the elimination of discrimination"). However, Mother points to nothing other than CYFD's failure to check a box indicating Mother and Children's race on the predispositional study. As well, Mother identifies nothing in the record that indicates CYFD (or the district court for that matter) failed to engage in its responsibility under Section 32A-1-3(E). Nor does Mother explain—and we fail to see—how what appears at most to be a single administrative oversight warrants reversal. "[I]n reviewing an issue on appeal, this Court presumes that the district court is correct and the burden is on the appellant to clearly demonstrate the district court's error." *Firstenberg v. Monribot*, 2015-NMCA-062, ¶ 57, 350 P.3d 1205 (alteration, internal quotation marks, and citation omitted). Mother failed to meet this burden. Accordingly, we decline to consider her argument further.

**CONCLUSION**

**{29}** For the foregoing reasons, we affirm the district court's termination of Mother's parental rights to Children.

**{30}  IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**