This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-40381

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

Petitioner-Appellee,

v.

**ANGEL K.,**

Respondent-Appellant,

and

**PETER P.,**

Respondent,

**IN THE MATTER OF PETER K.-P.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Marie C. Ward, District Court Judge**

Children, Youth & Families Department
Mary McQueeney, Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Appellee

Susan C. Baker
El Prado, NM

for Appellant

The Law Office of Ramsey & Hoon, LLC
Mark A. Ramsey
Albuquerque, NM

Guardian Ad Litem

**DECISION**

**BOGARDUS, Judge.**

**{1}**    Angel K. (Mother), a qualified individual with an intellectual disability protected by the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, appeals the termination of her parental rights to her child Peter K.-P. (Child). Mother's parental rights were terminated pursuant to NMSA 1978, Section 32A-4-28(B)(2) (2005, amended 2022), of the New Mexico Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2022). Mother argues that clear and convincing evidence does not support the district court's determination that (1) the Children, Youth and Families Department (CYFD) made reasonable efforts to accommodate Mother's disability in accordance with the ADA, and (2) the causes and conditions of the neglect that brought Child into custody are unlikely to change in the foreseeable future. For the reasons that follow, we affirm.

**DISCUSSION**

**{2}**    A court shall terminate parental rights when a child "has been a neglected or abused child as defined in the Abuse and Neglect Act and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." *See* § 32A-4-28(B)(2); *see also State ex rel. Child., Youth & Fams. Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 21, 132 N.M. 299, 47 P.3d 859 (same). "It is the state's burden to prove the statutory grounds for termination by clear and convincing evidence." *State ex rel. Child., Youth & Fams. Dep't v. Tammy S.*, 1999-NMCA-009, ¶ 13, 126 N.M. 664, 974 P.2d 158. "Clear and convincing evidence is defined as evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Child., Youth & Fams. Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (alteration, internal quotation marks, and citation omitted). "We will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact[-]finder could properly determine that the clear and convincing standard was met." *State ex rel. Child., Youth & Fams. Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted). Accordingly, when reviewing the district court's determinations, we ask "whether the [district] court's conclusion, when viewed in the light most favorable to the decision below, was supported by substantial evidence, not whether the trial court could have reached a different conclusion." *Patricia H.*, 2002-NMCA-061, ¶ 31.

**I.    Substantial Evidence Supports the Finding That CYFD Made Reasonable Efforts to Accommodate Mother's Disability**

**{3}**    Mother first argues that CYFD failed to present clear and convincing evidence that it made reasonable accommodations for her disability as required by the ADA, and therefore CYFD failed to provide reasonable efforts. We disagree, and explain.

**{4}**    "What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Patricia H.*, 2002-NMCA-061, ¶ 23. On appeal, "our job is not to determine whether CYFD did everything possible; our task is limited by our statutory scope of review to whether CYFD complied with the minimum required under law." *Id.* ¶ 28. When a parent falls within the protection of the ADA, CYFD must reasonably accommodate the parent's disability to meet the minimum requirements under law. *See State ex rel. Child., Youth & Fams. Dep't v. Johnny S., Sr.*, 2009-NMCA-032, ¶ 9, 145 N.M. 754, 204 P.3d 769 (providing that once the ADA is found to apply, the ADA requires "a more collaborative effort between the parents, CYFD, and the district court").

**{5}**    Early in the case, the parties agreed that the ADA applied to Mother, and the district court modified CYFD's efforts by ordering the following accommodations:

    a.    CYFD shall obtain medical, mental health, and other treatment records of [Mother] to assist with determining the nature of ADA assistance [Mother] will need. [Mother] will sign all necessary releases of information. Once obtained, these records will also be provided to counsel for [Mother].

    b.    CYFD shall provide hands-on assistance for [Mother] to obtain the assistance of a Community Support Worker via an appropriate service provider, and for her to obtain a psychological evaluation.

    c.    CYFD will work with treatment providers to ensure that treatment providers are able to deliver services in accord with [Mother]'s disabilities.

    d.    Any other necessary and reasonable accommodation required for [Mother]'s work on the court-ordered treatment plan.

**{6}**    The district court did not modify Mother's existing treatment plan at that time but agreed to revisit the issue after Mother's neuropsychiatric examination, which would provide information about any necessary additional accommodations.

**{7}**    The treatment plan, created by CYFD permanency planning worker James Anaya, took into consideration Mother's intellectual disability, requiring Mother to attend mental health counseling to identify and address Mother's disability.

**{8}** Mother contends that the treatment plan was complex, with numerous requirements involving unrelated providers that would be impossible for her to complete considering her disability. The district court's accommodations, however, did not modify the existing treatment plan, but addressed Mother's concerns by requiring CYFD to assign a community support worker, further investigate the nature of Mother's disability, and ensure that its permanency planning workers and services providers accommodated her disability. Mother was part of the collaborative process that agreed to these accommodations, *see Johnny S., Sr.*, 2009-NMCA-032, ¶ 9, and she failed to express the need for a simplified treatment plan during this process. As discussed below, CYFD made reasonable efforts to assist Mother by following the district court's order for reasonable accommodations.

**{9}** As to accommodations CYFD made in assisting Mother complete the items on her treatment plan, there is substantial evidence to support that beginning in February 2019, CYFD permanency planning workers (PPWs) took reasonable steps to accommodate Mother's disability by personalizing their services to Mother's needs. *See Patricia H.*, 2002-NMCA-061, ¶ 31 (stating that we must determine whether substantial evidence supports the district court's conclusion). Based on information about Mother's disabilities, PPW Anaya personalized his communication plan with Mother to include written notes, text messages, voice messages, frequent meetings, and constant telephone conversations. Mother's second PPW, Alyxandra Ortiz, testified that she would repeatedly explain information until Mother understood, encourage Mother to take notes, and send text messages so Mother would have access to written notes. PPW Thelma Rourke would spend hours explaining the treatment plan to Mother until she felt comfortable Mother understood the discussion. Jennifer Zapien, another of Mother's PPWs, made similar accommodation: repeating important information, writing notes, and providing reminders by text and email.

**{10}** Beyond tailoring their communication style to accommodate Mother's disability, PPWs testified that they worked with community support workers and service providers to ensure that Mother's disability was accommodated. PPW Ortiz repeatedly explained to Mother the importance of community support workers, worked to get Mother a community support worker and worked with the community support workers to ensure that Mother was completing a housing application and exploring housing options. PPW Ortiz further tried to bundle service providers to reduce the amount of appointments for Mother and worked with Trauma Treatment Center to accommodate Mother. She submitted a request to the social security administration for Mother's disability records, and a referral for Mother to undergo a neuropsychological evaluation.

**{11}** PPW Zapien ensured Mother's community support worker had relevant documentation about Mother's case and disability including the treatment plan, social security records, substance abuse assessment, and the neuropsychological evaluation. Further, PPW Zapien updated all of Mother's services providers on Mother's disability by sending a copy of Mother's neuropsychological evaluation.

**{12}** Mother contends that CYFD did not accommodate her disability until the spring of 2021, when CYFD shared the neuropsychological report with service providers. Testimony indicates, however, that CYFD accommodated her disability from the beginning. Her first PPW, Anaya, considered her disability in creating her treatment plan and personalized his communication plan with Mother. Similarly, other PPWs and service providers testified that they accommodated Mother's disability before receiving the neuropsychological report.

**{13}** This Court does not reweigh the evidence on appeal and views the evidence in the light most favorable to the district court's judgment. *See State ex rel. Child., Youth & Fams. Dep't v. Keon H.*, 2018-NMSC-033, ¶ 38, 421 P.3d 814. The evidence demonstrates that PPWs took Mother through the steps of the plan, and worked with service providers to ensure they accommodated Mother's disability. CYFD employed the reasonable efforts to assist Mother with her treatment plan. *See id.* ¶ 42. Reviewing the totality of the circumstances, including CYFD's efforts to accommodate Mother's disability, we conclude substantial evidence supports the district court's conclusion that CYFD made reasonable efforts to alleviate the causes and conditions that brought Child into custody. *See id.* ¶ 41 ("[W]e have traditionally considered the totality of the circumstances when reviewing the district court's [reasonable efforts] determination.").

## II. Substantial Evidence Supports the Finding That the Conditions and Causes of Neglect Were Unlikely to Change in the Foreseeable Future

**{14}** Mother also argues that CYFD did not present clear and convincing evidence to support the district court's conclusion that the conditions and causes of the neglect were unlikely to change in the foreseeable future. "We have interpreted the term 'foreseeable future' to refer to corrective change within a reasonably definite time or within the near future. We have also noted that in balancing the interests of the parents and children, the [district] court is not required to place the children indefinitely in a legal holding pattern." *Patricia H.*, 2002-NMCA-061, ¶ 34 (internal quotation marks and citations omitted).

**{15}** At trial, CYFD presented evidence that although Mother had made progress on some aspects of her treatment plan, she refused to cooperate with necessary referrals and assessments, which then delayed services she received, and failed to internalize the need for completing the treatment plan. Ortiz, parents' PPW until July 2019, testified that Mother would be combative and unwilling to engage with her treatment plan during their visits. PPW Ortiz stated that Mother initially refused to sign releases of information (ROI) which would have allowed PPW Ortiz to timely coordinate with Mother's community support worker, receive social security documents, and refer Mother to a neuropsychological evaluation. Without Mother's signature, PPW Ortiz could not communicate with Mother's community support worker or share Mother's treatment plan to ensure Mother's progress. Mother finally signed the ROI around October 2019, however, Mother stopped working with her community support worker approximately two months later.

**{16}** Further, Mother was responsible for delaying her neuropsychological evaluation, which gave her less time to make progress. Mother initially refused to sign the ROI to allow PPW Ortiz to make the referral. Once Mother signed the form and PPW Ortiz made the referral, Mother failed to schedule the appointment; once Mother finally scheduled the appointment, she did not go to it. After the missed appointment, PPW Ortiz had to make a new referral and convince Dr. Alexander to allow Mother to reschedule the appointment, however, Mother failed to reschedule the appointment. After more than a year's delay, the neuropsychological evaluation took place on October 2020.

**{17}** Ortiz testified that Mother refused to engage in important aspects of her treatment plan. Mother participated in a domestic violence assessment, but did not agree with the results of the assessment that identified her as the aggressor in the relationship. Mother refused to attend domestic violence classes, failed to complete a substance abuse assessment, had inconsistent participation in urinalysis drug testing, and refused to attend substance abuse counseling.

**{18}** Mother's failure to make significant progress on her treatment plan was a common theme among the PPWs' testimony. Dana Kilbane testified that during her time as Mother's PPW she only received progress reports from one service provider, and Mother failed to complete any items on her treatment plan. PPW Rourke testified that she did not receive any indication from service providers that Mother had completed any classes on her treatment plan. Mother's PPW from August 2020 to April 2021, PPW Zapien, testified that Mother failed to successfully complete services with any provider.

**{19}** PPW Zapien further testified about Mother's need for dialectical behavior therapy (DBT), stating that it is a court ordered treatment plan item that will address Mother's mental health issues. Mother, however, initially delayed assessments and referrals for DBT, which resulted in a two-year delay in her DBT attendance. Mother engaged in individual therapy other than DBT with multiple providers for several years, but she did not address the mental health issues that led CYFD to take custody of Child. Mother finally began regularly engaging with DBT in June 2021. Her service provider, however, testified that Mother's DBT program would require Mother's uninterrupted attendance for twelve to eighteen months to complete.

**{20}** Beyond refusing to timely engage with service providers, evidence demonstrated that Mother failed to internalize the importance of completing the treatment plan. PPW Zapien testified that Mother would be difficult to work with, and Mother did not internalize behavioral changes. Mother's counselor Melissa Nandina testified that Mother failed to take ownership of her CYFD case at any time between March 2020 and January 2021. Similarly, Ashley Martinez, Mother's mental health worker since July 2020, testified that Mother had made minimal progress on taking responsibility for the reasons Child was taken into CYFD custody and that she was in the process of discharging the family due to lack of progress.

**{21}** Furthermore, the district court continued the termination of parental rights trial on June 24, 2021, to give Mother additional time to attend in-person visits with service providers. The district court's decision to provide Mother with a few more months was intended to account for the case's complexities, including Mother's disability and the COVID-19 shut-down. Once the trial resumed three months later, however, Child had already been in CYFD custody for over two and a half years, and the district court concluded that the conditions were unlikely to be alleviated in the future. The district court could have reasonably concluded that waiting for Mother to complete DBT and internalize the importance of completing the treatment plan might well be too long to wait. *See Patricia H.*, 2002-NMCA-061, ¶ 35 (holding that the district court can reasonably conclude the time that it would take for a parent to complete the treatment plan might be too long to wait). Although Mother did participate and demonstrate improvement in some aspects of the treatment plan, her efforts to comply over the course of two-and-one-half years do not equate to improvement in alleviating the conditions that caused Child's neglect and abuse and did not demonstrate that the district court's conclusion was in error. *See State ex rel. Hum. Servs. Dep't v. Wayne S.*, 1989-NMCA-032, ¶ 7, 108 N.M. 486, 775 P.2d 252 ("When balancing the interests of parents and children, the court is not required to place the children indefinitely in a legal holding pattern, when doing so would be detrimental to the children's interests."); *see also State ex rel. Child., Youth & Fams. Dep't v. Nathan H.*, 2016-NMCA-043, ¶ 41, 370 P.3d 782 (noting that the father's past conduct was relevant to his current parental abilities and foreseeable events in light of evidence that he had not changed his situation in any meaningful way). In light of the evidence presented during the termination proceedings, we conclude that clear and convincing evidence supports the district court's conclusion that the causes and conditions of Child's neglect were unlikely to change in the foreseeable future.

**CONCLUSION**

**{22}** Based on the foregoing, we affirm.

**{23}  IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**ZACHARY A. IVES, Judge**

**KATHERINE A. WRAY, Judge**