# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMCA-063

Filing Date: July 19, 2021

No. A-1-CA-39128

STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,

      Petitioner-Appellee,

v.

JOSIE G.,

      Respondent-Appellant,

and

JULIAN G.,

      Interested Party,

IN THE MATTER OF ELIESE G.,

      Child.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
William E. Parnall, District Judge

Certiorari Denied, November 10, 2021, No. S-1-SC-38940. Released for Publication
December 14, 2021.

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Julie M. Saiz
Albuquerque, NM

Guardian Ad Litem

# OPINION

**BOGARDUS, Judge.**

**{1}** Josie G. (Mother) appeals the termination of her parental rights to her daughter, Eliese G. (Child).[1] Mother advances three arguments: (1) the proceedings constituted fundamental error that violated Mother's statutory rights under the Abuse and Neglect Act, (2) the proceedings violated Mother's procedural due process rights, and (3) insufficient evidence supported termination of Mother's parental rights. Unpersuaded, we affirm.

# BACKGROUND[2]

**{2}** Child was brought into Children, Youth and Families Department (CYFD) custody in January 2016, less than a month before her third birthday. In March 2016, Mother pleaded no contest to neglecting Child due to her domestic violence, substance abuse, and mental health issues.

**{3}** Child was initially diagnosed with disinhibited social engagement disorder, an attachment related disorder, and unspecified trauma related disorder, which manifested as hypervigilance, expressions of bad memories, angry outbursts, and refusal to cooperate with adult directives. Child's treating psychologist described Child as very angry and traumatized, hypervigilant, demanding, and exhibiting behaviors consistent with abuse. Child's treating psychologist testified that children as young as two years old can recall traumatic memories, and recommended that visits with Mother should begin as family therapy, maintained on the pace recommended by Child's therapist. In 2017, Child was additionally diagnosed with unspecified disruptive behavior disorder and later with oppositional defiant disorder.

**{4}** Before visitation began, Child talked about her fear of Mother and exhibited behavioral issues, including hurting herself and others. Child's therapist and treatment team believed that Child's acts of self-harm needed to be reduced before starting

---

1This case originally concerned both Child and her sibling; however, Child's sibling aged out of foster care before termination proceedings. Father also had his parental rights terminated in the same proceedings, and has not appealed that decision. Therefore, our opinion addresses only the facts and law relevant to Mother.

2The facts contained in this section explain the context of the termination of Mother's parental rights. All facts relied on in our affirmance of the termination of Mother's parental rights are discussed in the subsection regarding sufficiency of the evidence below. *See State ex. rel. Children, Youth & Families Dep't v. Brandy S.*, 2007-NMCA-135, ¶¶ 31-32, 142 N.M. 705, 168 P.3d 1129 (indicating that, generally, a district court must rely on evidence introduced at the termination of parental rights (TPR) hearing to make relevant findings of fact in relation to the termination of parental rights).

visitation with Mother because of the risk that contact with Mother would increase those harmful behaviors.

**November 2016 Through February 2017 Visitation**

{5}     When Child's behaviors had improved, the first round of visits began in November 2016 with Child's therapist facilitating family therapy sessions with Mother and Child. Mother behaved appropriately during the first visit and the visit went well. Mother had additional visits in January and February 2017 and Mother's behavior was appropriate during these visits.

{6}     After these visits with Mother, however, Child's harmful behavioral issues increased. A few weeks after the November visit, Child attacked her therapist by throwing things and hitting and scratching her. Child's negative behavior continued following the January and February visits. Child was aggressive, impulsive, hyperactive, lashed out unexpectedly, and engaged in behaviors that required therapeutic holds. Child's behavior included throwing herself to the ground, scratching at her face, punching herself in the face, pulling out her hair, and kicking the ground with such force that Child's therapist worried Child would break her feet. Child's treatment team decided to suspend visitation with Mother in order to stabilize Child, and within a few months after visits with Mother ended, Child's behavior improved; Child continued to exhibit some behavioral issues, such as screaming and crying on the floor, but Child did not attempt to harm herself and did not require therapeutic holds.

**September Through November 2017 Visitation**

{7}     The second round of visitation consisted of three visits beginning in September 2017 and continuing through November 2017. Child's therapist conferred with Mother's therapist regarding family therapy sessions, which occurred monthly during this time. In September, when Child's therapist was attempting to prepare Child for the upcoming visits with Mother, Child stated that Mother was mean; Mother did not feed her; Mother was evil; and she was afraid of Mother. Even so, Mother's behavior was appropriate during these visits, and Mother effectively incorporated feedback from Child's therapist about how to engage with Child.

{8}     After these visits with Mother, Child yet again became more irritable, angry, and once again began hurting herself by pulling out her hair and scratching her face. During the November visit, Child was irritable, agitated, and stated that she did not want to see Mother, but Child's therapist proceeded with the family therapy session. During the November session, Child ran from the therapy room where she was visiting with Mother. Visitation was then suspended for two reasons: at the recommendation of Child's treatment team, and due to Child's disclosure of sexual abuse by Mother.

{9}     Following the suspension of visitation, Child began to stabilize after a few months. However, in early 2018 Child began describing "Mr. Sink," a tall dark person with a black hat and red eyes, who, according to Child, did not like Child's therapist and

would stand behind Child's therapist during discussions of Mother. During therapy, when first discussing Child's disclosure of sexual abuse by Mother, Child said "no no no no no" under her breath and deepened her voice, addressing the therapist as Mr. Sink. After this event, Child took longer to stabilize than previously, and Child refused to enter her therapy room until her therapist showed her that there was no one else in the room. Child's self-harming behavior continued, but lessened over time. By the end of 2018, Child was not hurting herself and no longer discussed Mr. Sink.

**February 2019 Attempted Visitation**

{10}    The third and final attempt at visitation occurred in February 2019. At that time, Child was stable, was not hurting herself, and would enter her therapy room without difficulty. A plan was developed to restart visits with Mother, beginning with phone contact, sharing of photos, discussions of Mother in Child's therapy sessions, and then family therapy with Mother. During the February 2019 treatment team meeting, Child spoke with Mother by phone, and Child's therapist told Child during a therapy session about the plan to restart visits with Mother.

{11}    The following week, Child refused to enter the room for her weekly therapy session and stated that her stomach was hurting; Child asked to go to the bathroom, where she was found masturbating. Child's negative behaviors increased in the weeks that followed—she was irritable, aggressive, discussed two voices in her head that told her to be angry, and described seeing shadows on her wall that were mean to her. The plan to restart visitation with Mother was abandoned due to concern that Child's increased behavioral issues would require residential treatment.

{12}    Although it was uncontested that Mother completed her treatment plan, CYFD moved to terminate Mother's parental rights and following a five-day TPR hearing, the district court terminated Mother's parental rights.

**DISCUSSION**

**I.      Alleged Statutory Violations Do Not Constitute Fundamental Error**

{13}    Mother alleges that the proceedings violated her rights under the Abuse and Neglect Act because: (1) CYFD "permanently suspended" her visits with Child in November 2017, and "unilaterally" decided to keep Child in custody without a plan to return home; and (2) the district court failed to dismiss the case, change the permanency plan, or return Child to Mother by July 31, 2017, which Mother alleges violated the six-month timeline outlined in NMSA 1978, Section 32A-4-25.1(D) (2009, amended 2016).

{14}    As Mother concedes, she failed to preserve her arguments regarding alleged violations of her statutory rights, and we therefore review for fundamental error. "[T]ermination of parental rights cases can be candidates for fundamental error analysis[,]" and "we will address unpreserved errors that go to the foundation of the

case, and which deprive the defendant of rights essential to his [or her] defense. Although fundamental error does not generally apply in civil cases, we will apply the doctrine in exceptional cases." *State ex. rel. Children, Youth & Families Dep't v. Paul P., Jr.*, 1999-NMCA-077, ¶ 14, 127 N.M. 492, 983 P.2d 1011 (internal quotation marks and citation omitted).

## A.    The Record Does Not Support Mother's Characterization of the Facts Regarding the November 2017 Suspension of Visits

**{15}**    To the extent that Mother claims that CYFD "permanently suspended" her visits with Child in November 2017 and "unilaterally" kept child in custody, without a plan to return home, we note that Mother fails to direct us to evidence in the record to support these allegations, and where a party fails to cite any portion of the record to support its factual allegations, this Court need not consider its argument on appeal. *See Santa Fe Expl. Co. v. Oil Conservation Comm'n*, 1992-NMSC-044, ¶ 11, 114 N.M. 103, 835 P.2d 819; *see also* Rule 12-318(A)(3) NMRA (requiring briefs in chief to contain "a summary of proceedings, briefly describing the nature of the case, the course of proceedings, and the disposition in the court below, and including a summary of the facts relevant to the issues presented for review[, which] summary *shall contain citations to the record proper, transcript of proceedings, or exhibits supporting each factual representation*" (emphases added)).

**{16}**    Nonetheless, our own review of the record demonstrates that, contrary to Mother's claims, the November 2017 suspension of visits was neither unilateral nor permanent, and Child's permanency plan of reunification remained intact.

**{17}**    The decision to suspend visits in November 2017 was not a unilateral one by CYFD. In fact, the suspension was therapeutically recommended. Child's therapist testified that Mother's visits were suspended at that time because of Child's recent disclosures of sexual abuse by Mother, and for therapeutic reasons, based on Child's negative behavior following visits with Mother. Child's therapist further testified that the therapeutic recommendation against continued visitation with Mother would still have been made *regardless* of the sexual abuse allegations, and was due to concern that Child's behavioral issues might require a higher level of care than treatment foster care. Because the November 2017 suspension of visits was therapeutically recommended, the suspension was not a unilateral decision by CYFD as Mother alleges.

**{18}**    Additionally, although Mother alleges the November 2017 suspension of visits was permanent, the evidence suggests that it was not. This is most readily apparent by the later attempt in February 2019 to restart visitation between Child and Mother, after Child's behavioral issues stabilized.

**{19}**    Finally, the November 2017 suspension of visits did not keep Child in CYFD custody without a plan to return home, as Mother alleges, because although visitation was temporarily suspended, efforts continued to stabilize Child and prepare her for visits with Mother. From the time visits were suspended in November 2017 to February

2019, when the next attempt was made to restart visitation, Child's therapist continued weekly and monthly efforts to engage Child in discussions of Mother in therapy to prepare Child for future visits with Mother.

**{20}**    After diligent review, this Court concludes that the record does not support Mother's characterization of the facts relating to the November 2017 suspension of visitation and this Court does not consider Mother's arguments on this issue further.

**B.    The Alleged Statutory Timeline Violation Does Not Constitute Fundamental Error**

**{21}**    Mother argues that the six-month timeline in Section 32A-4-25.1(D) required the district court to dismiss the case, change the permanency plan, or complete a plan to transition home by July 31, 2017; therefore, the district court's failure to take one of these actions until December 19, 2018, when the district court changed the permanency plan to adoption, violated Mother's statutory rights and constitutes fundamental error. CYFD responds that this case was exempted from the six-month timeline in Section 32A-4-25.1(D) because NMSA 1978, Section 32A-4-29(G)(5) (2009) allows for extended time in CYFD custody when a child is incapable of functioning in a family setting. Mother contends, for various reasons, that the statutory exception in Section 32A-4-29(G)(5) does not apply. However, even assuming that the statutory exception in Section 32A-4-29(G)(5) does not apply to Child, under the facts of this case, the district court's failure to dismiss the case, change the permanency plan, or complete a transition home until December 19, 2018, does not rise to the level of fundamental error. We explain.

**{22}**    During the nearly eighteen-month period at issue, Mother's compliance with her treatment plan improved. The record demonstrates that as of August 2017, Mother was not fully in compliance with her treatment plan because she repeatedly tested positive for marijuana in her drug screenings, and tested positive for marijuana use as recently as July 2017. The district court found that by December 2018 Mother had "worked extensively" on her treatment goals, and noted no failures to comply with the case plan, such as the failed drug screenings noted in previous findings. Although CYFD proposed changing Child's permanency plan to adoption in August 2017, the district court *maintained* the plan of reunification and ordered continued visits. Additionally, as described above, visitation was attempted during this eighteen-month period; although visitation was suspended in November 2017 for therapeutic reasons, Mother demonstrated appropriate behavior with Child during the visits in the fall of 2017 and effectively incorporated feedback from Child's therapist about how to best engage with Child. During the TPR hearing, CYFD stipulated to Mother's completion of her treatment plan, and CYFD presented evidence confirming Mother's appropriate behaviors in her visits during the fall of 2017. In essence, this eighteen-month period in CYFD custody created additional opportunities for Mother to fully comply with her treatment plan and for additional attempts to reestablish visitation with Child. Therefore, even if the district court failed to comply with the six-month timeline set out in Section 32A-4-25.1(D), the additional time before termination proceedings *benefitted* Mother's defense to

termination. We conclude that because the alleged error does not "go to the foundation of the case, [or] deprive [Mother] of rights essential to [her] defense[,]" it does not constitute fundamental error. *See Paul P., Jr.*, 1999-NMCA-077, ¶ 14 (internal quotation marks and citation omitted).

## II. Mother's Procedural Due Process Rights Were Not Violated

**{23}**  Mother contends that the above-described proceedings, which allegedly violated the six-month timeline required by Section 32A-4-25.1(D), also violated her right to procedural due process.

**{24}**  "Whether an individual was afforded due process is a question of law that we review de novo." *State ex rel. Children, Youth & Families Dep't v. Rosalia M.*, 2017-NMCA-085, ¶ 8, 406 P.3d 972 (alteration, internal quotation marks, and citation omitted). "To evaluate the due process owed to a parent in termination proceedings, we use the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 . . . (1976)." *Rosalia M.*, 2017-NMCA-085, ¶ 9. Three factors are weighed under that test: "the parent's interest; the risk to the parent of an erroneous deprivation through the procedures used in light of the probable value, if any, of additional or substitute procedural safeguards; and the government's interest." *Id.* A parent's fundamental interest in the parent-child relationship and the state's interest in protecting the welfare of the children balance equally; therefore, the second *Mathews*' factor is dispositive. *State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003-NMSC-015, ¶ 20, 133 N.M. 827, 70 P.3d 1266. "Our conclusion does not depend on a showing that [the m]other would have been successful if she had been provided with the additional procedures she alleges should have been provided; rather, [the m]other need only show that there is a reasonable likelihood that the outcome might have been different." *State ex rel. Children, Youth & Families Dep't v. Browind C.*, 2007-NMCA-023, ¶ 31, 141 N.M. 166, 152 P.3d 153 (emphasis, internal quotation marks, and citation omitted).

**{25}**  In *Paul P., Jr.*, this Court reversed the district court's dismissal of the father from adoption proceedings. 1999-NMCA-077, ¶ 1. This Court held that the father's due process rights were violated when the district court erroneously interpreted the criminal sexual penetration statute and determined that the father's consent was not required for the adoption of the child because, based on the age of the mother, the child was conceived as the result of conduct constituting criminal sexual penetration. *Id.* ¶¶ 1, 4-5. Because the child in *Paul P., Jr.* "was not actually conceived as a result of rape as argued" by CYFD, the Children's Code required that the father "be allowed to defend against termination of parental rights in a full evidentiary hearing following procedures, including the filing of a petition[.]" *Id.* ¶ 13.

**{26}**  Mother argues that she was denied due process because, like the parent in *Paul P., Jr.*, she was "excluded" from the proceedings when CYFD acted "unilaterally" and without judicial oversight. To the extent that Mother bases this argument on her characterization of the facts underlying the November 2017 suspension of visits, we do not consider the argument further for the reasons we previously discussed. To the

extent that Mother bases her argument on alleged violations of statutory deadlines during the eighteen-month period described above, we remain unpersuaded.

**{27}** Although Mother alleges that she was "excluded from the proceedings just as surely as the respondent father was excluded in *Paul P., Jr.*," we note that Mother does not direct this Court to any proceedings where she was not present, unrepresented by counsel, denied the opportunity to cross-examine CYFD's witnesses or present evidence of her own, or denied an impartial decision-maker. Significantly, Mother does not allege that there is a reasonable likelihood that the outcome of the termination proceedings might have been different had CYFD complied with the statutory deadlines it allegedly violated. *See Browind C.*, 2007-NMCA-023, ¶ 31 (requiring a respondent parent to "show that there is a reasonable likelihood that the outcome might have been different" had additional procedural safeguards been provided (emphasis, internal quotation marks, and citation omitted)).

**{28}** Because our own review of the record demonstrates that the eighteen-month period of time that allegedly violated statutory deadlines *benefitted* Mother's defense in certain ways—creating additional time for her to fully comply with her treatment plan and allowing time for further attempts to reestablish visitation with Child—we will not guess at Mother's undeveloped arguments or the probable value of a shorter timeline for attempted reunification. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

**{29}** Because Mother fails to fully develop her argument regarding the alleged due process violations, and because our own review of the record reveals no reasonable likelihood that a shorter timeline would result in a different outcome, we conclude that Mother's procedural due process rights were not violated.

### III.    Substantial Evidence Supports Termination of Parental Rights

**{30}** Mother contends that CYFD failed to present sufficient evidence that (1) the conditions and causes of the neglect and abuse were unlikely to change in the foreseeable future, (2) CYFD made reasonable efforts to assist Mother in adjusting the conditions that rendered her unable to properly care for Child, (3) termination of parental rights was in Child's best interests, and (4) Child was adoptable. We address each in turn.

**{31}** We consider the district court's findings in relation to the "substantial evidence" standard. *See, e.g.*, *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶¶ 22, 31, 132 N.M. 299, 47 P.3d 859 (reviewing the district court's "reasonable efforts" finding for substantial evidence). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 36, 421 P.3d 814 (internal quotation marks and citation omitted). In determining whether the substantial evidence standard is met, we do not reweigh all the evidence presented to

the district court or "substitute our judgment for that of the [district] court as to any factual matter"—but rather defer to the district court's conclusions. *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. Overall, "we view the evidence in the light most favorable to support the [district] court's findings and conclusions of law." *State ex rel. Children, Youth & Families Dep't v. David F., Sr.*, 1996-NMCA-018, ¶ 34, 121 N.M. 341, 911 P.2d 235.

{32} Because the standard of proof applicable to the termination of parental rights determination is clear and convincing evidence, the district court's findings are valid only if they meet that standard. *See Keon H.*, 2018-NMSC-033, ¶ 37 (recognizing that a parent cannot be deprived of parental rights without due process of law and that "[d]ue process requires that findings necessary to terminate parental rights be supported by clear and convincing evidence"). "Clear and convincing evidence means evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted).

**A.     Substantial Evidence Supports the District Court's Finding That the Causes and Conditions of Neglect Were Unlikely to Change in the Foreseeable Future**

{33} In order to terminate parental rights with respect to a neglected or abused child, the district court must find that "the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future[.]" NMSA 1978, Section 32A-4-28(B)(2) (2005). Mother argues that: (1) CYFD failed to demonstrate that Child's "discomfort [with Mother] actually existed" because Child's behavioral issues occurred *after* visits with Mother; and (2) even if such behavioral issues were related to contact with Mother, the evidence presented was not current and, therefore, did not support a finding that the condition was unlikely to change in the foreseeable future.

**1.     Child Was Traumatized and Her State of Mind Was Not Conducive to Reunification**

{34} To the extent that Mother argues that CYFD failed to demonstrate that Child's "discomfort [with Mother] actually existed" because Child's behavioral issues occurred *after* visits with Mother, we presume such an argument to challenge the district court's finding that Child was traumatized and that her state of mind was not conducive to reunification.

{35} Child's treating therapist and her treatment coordinator each testified about their personal observations of significant increases in Child's behavioral issues and harmful behavior following contact with Mother, including: impulsivity, hyperactivity, aggressive behaviors, unpredictable mood swings, falling to the ground screaming, kicking the ground hard enough to risk injury, scratching and punching her face, punching her legs, pulling at her hair, pinching and biting her arms, and sexualized behaviors. Additionally, Child's descriptions of "Mr. Sink" arose during Child's discussion of sexual abuse by

Mother, and in general, Child's references to hallucinations of voices and shadows occurred in the weeks and months following contact with Mother.

**{36}** Although Child's behavioral issues arose after contact with Mother and not *during* contact with Mother, "[o]ur standard of review requires us to determine whether the [district] court's conclusion, when viewed in the light most favorable to the decision below, was supported by substantial evidence, not whether the [district] court could have reached a different conclusion." *Patricia H.*, 2002-NMCA-061, ¶ 31. Even though Child's behavioral issues did not occur during her family therapy sessions with Mother or during her phone contact with Mother, from the evidence presented, the district court could reasonably conclude, by the standard of clear and convincing evidence, that Child was severely traumatized and her state of mind was not conducive to reunification with Mother.

**2.      The Causes and Conditions of Neglect That Brought Child Into Custody Were Not Alleviated and Were Unlikely to Change in the Foreseeable Future**

**{37}** Mother challenges the district court's finding that the causes and conditions of neglect that brought Child into custody were not alleviated and were unlikely to change in the foreseeable future. Specifically, Mother contends that CYFD relied on an impermissible presumption that Child's issues continued to the time of the termination proceedings and, therefore, absent current evidence, CYFD failed to demonstrate that this condition was unlikely to change in the foreseeable future.

**{38}** "We have interpreted the term 'foreseeable future' to refer to corrective change within a reasonably definite time or within the near future. We have also noted that in balancing the interests of the parents and children, the [district] court is not required to place the children indefinitely in a legal holding pattern." *Id.* ¶ 34 (internal quotation marks and citations omitted).

**{39}** In *State ex. rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, this Court rejected CYFD's reliance "on vague references to [the f]ather's past to draw speculative inferences about the current and future existence of the causes and conditions of neglect." 2016-NMCA-021, ¶ 40, 366 P.3d 282. During the termination proceedings in *Alfonso M.-E.*, CYFD presented evidence of the father's "history of substance abuse," but "no evidence" regarding whether he continued to abuse alcohol. *Id.* This Court reasoned that "CYFD is not entitled to transfer its evidentiary burden [to the father,] . . . particularly when [the f]ather made efforts to comply with a treatment plan that imposes responsibilities on CYFD to assess the continuing existence of the causes and conditions of neglect." *Id.* ¶ 37.

**{40}** To the extent that Mother claims that, like *Alfonso M.-E.*, this case involves mere speculation of Mother's inability to safely parent Child, we disagree. In *Alfonso M.-E.*, CYFD presented *no* evidence of the father's continued issues with alcohol abuse, only evidence of a past substance abuse problem. *Id.* In contrast, the case at hand involved years of evidence of Child's continued pattern of severe behavioral issues following

contact with Mother. As recently as February 2019, Child demonstrated severe behavioral issues following phone contact with Mother. Because CYFD presented evidence of Child's continued behavioral issues following contact with Mother as recently as five months before termination proceedings, which began in July 2019, we cannot say that the district court impermissibly relied on speculation for its finding that the conditions of neglect continued to the time of termination. Stated differently, because Mother could not safely have contact with Child, it was reasonable for the district court to conclude that Mother could not safely parent Child.

{41}    In *State ex. rel. Children, Youth & Families Dep't v. Hector C.*, this Court held that there was not clear and convincing evidence to support the finding that the causes and conditions of neglect were unlikely to change in the foreseeable future where the "[f]ather's incarceration played an overwhelming and singular role in the termination proceedings[,]" and yet after the father's "release from prison, he participated willingly, voluntarily, and enthusiastically in all the programs that CYFD recommended." 2008-NMCA-079, ¶¶ 15, 17, 21, 144 N.M. 222, 185 P.3d 1072. Because the evidence relied on for termination was based overwhelmingly on conditions that were demonstrably no longer in effect—the father's incarceration—the evidence was stale for purposes of determining "whether those conditions persisted at the time of the hearing or would persist into the future." *Id.* ¶ 16 (internal quotation marks and citation omitted).

{42}    To the extent that Mother relies on *Hector C.* for her contention that CYFD presented only an impermissible "inference of future harm[,]" we disagree. The evidence relied upon in *Hector C.* was stale because it was based on conditions no longer in effect, namely, the father's incarceration, rather than the more recent evidence of the father's compliance with CYFD recommended programs after his release from prison. *Id.* ¶¶ 15, 17, 21. Here, the evidence demonstrated that Child's inability to safely adjust to contact with Mother was a consistent pattern across all three attempts to establish visitation, and the pattern continued *despite* Mother's ongoing compliance with her treatment plan and appropriate behavior during visits. Unlike the significant change in the father's circumstances in *Hector C.*, Mother does not direct this Court to any change in circumstances that would affect the ongoing pattern of Child's behavioral issues following contact with Mother, and our own review of the record reveals none.

{43}    Because CYFD presented evidence of the pattern of Child's inability to safely manage contact with Mother spanning years and continuing as recently as five months prior to termination, and because we see no change in circumstances that would indicate this pattern of behavioral issues was unlikely to continue into the foreseeable future, we conclude that clear and convincing evidence supported the district court's finding that the causes and conditions of neglect were not alleviated and were unlikely to change in the foreseeable future.

**B.    Substantial Evidence Supports the District Court's Finding That CYFD Made Reasonable Efforts**

**{44}** Mother challenges the district court's finding that CYFD made reasonable efforts and contends that her visits with Child were terminated "in an almost whimsical process, without consultation, much less collaboration, with Mother or Mother's therapist."

**{45}** In order to terminate parental rights with respect to a neglected or abused child, the district court must find that "the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future *despite reasonable efforts by the department* . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." Section 32A-4-28(B)(2) (emphases added). "[W]hat constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Keon H.*, 2018-NMSC-033, ¶ 41 (internal quotation marks and citation omitted). CYFD's efforts need only be reasonable, not perfect. *See id.* ¶ 43. Moreover, CYFD need not do "everything possible" to assist a parent; instead, the focus is on whether it has done the minimum required by law. *See Patricia H.*, 2002-NMCA-061, ¶ 28.

**{46}** Here, CYFD attempted to reestablish the relationship between Child and Mother three times between 2016 and 2019, each time suspending visitation plans based on Child's severe behavioral issues following contact with Mother and out of concern that Child might require residential treatment for those behavioral issues. In between these three rounds of visitation, CYFD continued to provide services to stabilize Child and prepare her for future contact with Mother. These services included weekly therapy sessions, mood-stabilizing medication, monthly psychiatric appointments, treatment foster care, and coordination of Child's care through monthly treatment team meetings. The evidence demonstrates serious concerns by Child's treatment team about the damaging effect of repeated attempts at contact between Child and Mother, notwithstanding Mother's appropriate behaviors during visits.

**{47}** To the extent Mother argues that it was "whimsical" for CYFD to suspend visits without consultation or collaboration with Mother or Mother's therapist, we remain unpersuaded. The issues preventing visitation were Child's self-harming behaviors following contact with Mother; therefore, it was reasonable for CYFD to follow the recommendations of *Child*'s treating therapist regarding the suspension of visits and appropriate treatment to stabilize Child. By focusing on Child's safety and therapeutic needs, CYFD's efforts were directed at the appropriate cause of the issue—Child's mental health. *See State ex. rel. Children, Youth & Families Dep't v. Athena H.*, 2006-NMCA-113, ¶ 13, 140 N.M. 390, 142 P.3d 978 (concluding that substantial evidence supported a finding that CYFD made reasonable efforts when visits with the mother were suspended at the recommendation of the children's therapists who believed that "visits had a detrimental effect on the children, who became traumatized, regressed in behavior, and were not able to progress in therapy"). NMSA 1978, Section 32A-4-22(C) (2009, amended 2016), states that "[r]easonable efforts shall be made to preserve and reunify the family, *with the paramount concern being the child's health and safety.*" (Emphases added.) Thus, CYFD's focus on Child's therapeutic needs and the recommendations from Child's therapist was both reasonable under the circumstances

and in accordance with CYFD's statutory duty to prioritize Child's health and safety when making efforts towards reunification.

**{48}** To the extent that Mother challenges the reasonableness of CYFD's efforts because visitation was planned by Child's therapist, we remain unpersuaded. Child's psychologist, an expert witness, recommended that the pace of family therapy between Child and Mother be determined by Child's therapist. Additionally, Child's psychologist testified that although reunification with Mother would not be possible without family therapy, he would not recommend family therapy with Mother if it was going to stress Child to the degree that Child required residential treatment. Child's psychiatrist testified that, in his opinion, Child's pattern of regressive, oppositional, physically aggressive, agitated behavior following contact with Mother took away any possibility for family therapy to be beneficial, noting that the team was "barely" keeping Child in her treatment foster home and "any escalation" might have led to hospitalization of Child. Child's psychiatrist also testified that he believed that Child's therapist's approach to family therapy with Mother was reasonable.

**{49}** We conclude that, under these circumstances, CYFD presented sufficient evidence for the district court to find, by a clear and convincing standard, that CYFD made reasonable efforts to reunify Child and Mother by attempting family therapy with Mother and providing services to address Child's mental health, behavioral issues, and ability to safely maintain contact with Mother.

**C.      Substantial Evidence Supports the District Court's Finding That Termination of Parental Rights Was in Child's Best Interests**

**{50}** Mother argues that CYFD failed to present sufficient evidence demonstrating that termination of parental rights was in Child's best interest, claiming there was "no evidence that Child [would] be better off in treatment foster care[,]" and evidence that reunification with Mother would harm Child was "murky at best."

**{51}** CYFD must show that termination of parental rights is in the best interests of the child, "[h]owever, the termination of parental rights cannot be based on a best interests determination alone. The fact that a child might be better off in a different environment is not a basis for termination of parental rights[.]" *Patricia H.*, 2002-NMCA-061, ¶ 21 (internal quotation marks and citations omitted).

**{52}** CYFD presented evidence that Child suffered from significant mental health and behavioral issues following contact with Mother, despite weekly therapy, mood-stabilizing medications, and treatment foster care. When visits with Mother were suspended, Child's behaviors stabilized. Although Child was required to change treatment foster homes in September 2019 Child's behavior did not require immediate removal, and her behavior in her newer foster home improved; Child was successfully able to form attachments with her new foster parents and the other children in the home.

**{53}** "[W]e view the evidence in the light most favorable to support the [district] court's findings and conclusions of law[,]" *see David F., Sr.*, 1996-NMCA-018, ¶ 34, and we will not substitute our judgment for that of the district court, instead deferring to the district court's conclusions. *Vanessa C.*, 2000-NMCA-025, ¶ 24. Despite evidence that Child continued to experience some behavioral issues while in treatment foster care, even during times when Child was not in contact with Mother, CYFD presented sufficient evidence for the district court to reasonably conclude, by a clear and convincing standard, that termination of parental rights was in Child's best interests.

## D. Mother's Undeveloped Argument Regarding Adoptability

**{54}** Mother argues—in a single sentence and without citation to the record or supporting authority—"that CYFD has failed to prove that Child is adoptable."

**{55}** "We will not review unclear arguments, or guess at what a party's arguments might be." *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 (alteration, internal quotation marks, and citation omitted). "To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them." *Id*. Additionally, "[w]e will not search the record for facts, arguments, and rulings in order to support generalized arguments." *Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104. Given Mother's lack of a developed argument regarding adoptability, we need not consider it further.

## CONCLUSION

**{56}** For the above reasons, we affirm the district court's termination of Mother's parental rights.

**{57}** IT IS SO ORDERED.

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**BRIANA H. ZAMORA, Judge**

**SHAMMARA H. HENDERSON, Judge**